NO. CIV-14-413-F

---

### IN THE UNITED STATES DISTRICT COURT FOR
### THE WESTERN DISTRICT OF OKLAHOMA

---

**VELENCIA MAIDEN,**

**Plaintiff,**

**v.**

**THE CITY OF OKLAHOMA CITY, *et al.*,**

**Defendants.**

---

### DEFENDANT CITY'S BRIEF IN SUPPORT OF ITS
### MOTION FOR SUMMARY JUDGMENT

---

**KENNETH JORDAN**
**Municipal Counselor**

By:   **Richard C. Smith, OBA #8397**
      **Jennifer Warren, OBA #30284**
      **Assistant Municipal Counselors**
      **200 N. Walker, Suite 400**
      **Oklahoma City, OK 73102**
      **(405) 297-2451   FAX (405) 297-3851**
      **Attorneys for Defendant**
      **City of Oklahoma City**
      **rick.smith@okc.gov**
      **jennifer.warren@okc.gov**

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................... ii

Material Facts Not In Dispute .................................................................................... 1

Statement of the Case ............................................................................................... 13

Standard on Summary Judgment .............................................................................. 14

Argument and Authorities ......................................................................................... 14

    Proposition I:  The Defendant Officers Did Not
    Commit a Constitutional Violation ......................................................................... 14

    Proposition II:  Defendant City's Policies, Procedures,
    and Customs are Constitutional .............................................................................. 17

    Proposition III:  Defendant City's Training and
    Supervision of its Police Officers is Constitutional .............................................. 22

    Proposition IV:  Defendant City Cannot be Liable
    on Plaintiff's State Law Claims .............................................................................. 25

    Proposition V:  Defendant City Cannot be Liable
    On Plaintiff's State Constitutional Claim .............................................................. 28

Conclusion ................................................................................................................ 30

Certificate of Service ............................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).......................................................................... 14

*Barney v. Pulsipher*,
  143 F.3d 1299 (10th Cir. 1998) ............................................... 17, 23

*Board of Comm'rs of Bryan Cty. v. Brown*,
  520 U.S. 397 (1997).......................................................................... 24

*Bosh v. Cherokee County Governmental Building Authority*,
  2013 OK 9, 305 P.3d 994 ........................................................... 29, 30

*Bryson v. City of Oklahoma City*,
  627 F.3d 784 (10th Cir. 2010), *cert denied* _____ U.S._____,
  131 S.Ct. 3030 (2011)............................................................... 10, 23

*Canton v. Harris*,
  489 U.S. 378 (1989)................................................................... 22, 23

*Carr v. Castle*,
  337 F.3d 1221 (10th Cir. 2003) ......................................... 9, 19, 23

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).......................................................................... 14

*City of Los Angeles v. Heller*,
  475 U.S. 796 (1986)................................................................... 15, 17

*City of Oklahoma City v. Tuttle*,
  471 U.S. 808 (1985).......................................................................... 18

*City of St. Louis v. Praprotnik*,
  485 U.S. 112 (1986)................................................................... 10, 21

*Connick v. Thompson*,
  __ U.S. __, 131 S. Ct. 1350 (2011)....................................... 22, 24

*Cordova v. Aragon*,
  569 F.3d 1183 (10th Cir. 2009) ............................................... 10, 24

*Cruz v. City of Laramie, Wyoming,*
   239 F.3d 1183 (10th Cir. 2001) ........................................................... 5, 10, 19

*Franklin v. Thompson,*
   981 F.2d 1168 (10th Cir. 1992) ................................................................. 9

*Garrett v. Athens-Clarke County, Ga,*
   378 F.3d 1274 (11th Cir. 2004) ............................................................... 20

*Graham v. Connor,*
   490 U.S. 386 (1989) ................................................................... 15, 16, 18

*Gunter v. Township of Umberton,*
   535 Fed. Appx. 144 (3rd Cir. 2013) ......................................................... 20

*Lounds v. Torres,*
   217 Fed.Appx. 755 (10th Cir. 2007) ......................................................... 9

*Marquez v. City of Albuquerque,*
   399 F.3d 1216 (10th Cir. 2005) .............................................................. 16

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) ........................................................................ 14

*McMullen v. City of Del City,*
   1996 OK CIV APP 46, 920 P.2d 528 ......................................................... 26

*Monell v. Dep't. of Social Services,*
   436 U.S. 658 (1978) ........................................................................ 18

*Myers v. Oklahoma County Board of County Commissioners,*
   151 F.3d 1313 (10th Cir. 1998) .............................................................. 27

*Novitsky v. City of Aurora,*
   491 F.3d 1244 (10th Cir. 2007) .............................................................. 16

*Parker v. City of Midwest City,*
   1993 OK 29, 850 P.2d 1065 ................................................................. 26

*Pennsylvania v. Mimms,*
   434 U.S. 106 (1977) ........................................................................ 16

*Perry v. City of Norman,*
   2014 OK 119, 341 P.3d 689 ................................................................. 29

*Pino v. Higgs,*
    75 F.3d 1461 (10th Cir. 1996) ....................................................... 15

*Prichard v. City of Oklahoma City,*
    1999 OK 5, 975 P.2d 914 ........................................................ 27, 28

*Rojas ex. rel. Rojas-Ramirez v. Anderson,*
    2012 WL 2153941 (D. Colorado June 13, 2012) .................................. 16, 17

*Salazar v. City of Oklahoma City,*
    1999 OK 20, 976 P.2d 1056 .......................................................... 28

*Schmidt v. Grady County,*
    1997 OK 92, 943 P.2d 595 .................................................... 26, 27, 28

*Schneider v. City of Grand Junction Police Department,*
    717 F.3d 760 (10th Cir. 2013) ...................................................... 18

*Scott v. Harris,*
    550 U.S. 372 (2007) ............................................................ 11, 14

*Tennessee v. Garner,*
    471 U.S. 1 (1985) .................................................................... 4

*U.S. v. Hensley,*
    469 U.S. 221 (1985) ................................................................ 16

*U.S. v. Melendez-Garcia,*
    28 F.3d 1046 (10th Cir. 1994) ...................................................... 16

*Wilson v. City of Chicago,*
    2011 WL 1003780 (N.D. Ill. 2011) ................................................... 6

*Wilson v. Meeks,*
    52 F.3d 1547 (10th Cir. 1995), *reversed and remanded on other grounds,*
    98 F.3d 1247 (10th Cir. 1996) ...................................................... 21

## United States Constitution

Fourth Amendment ................................................... 13, 15, 16, 17, 20

**Federal Statutes**

42 U.S.C. § 1983 ........................................................................................... 13, 17, 22, 25

**Oklahoma Constitution**

Article 2, § 30 ........................................................................................................... 29

**State Statutes**

43A O.S. § 1-103(13) ................................................................................................ 15

43A O.S. § 5-207 ........................................................................................ 2, 11, 15, 28

51 O.S. §§ 151-172 .................................................................................................... 26

51 O.S. § 153 ............................................................................................................. 26

51 O.S. § 155(6) ............................................................................................ 26, 28, 29, 30

70 O.S. § 3311 ........................................................................................................ 2, 3

**Ordinances**

OKC Municipal Code § 43-4 ......................................................................................... 4

**Rules**

Fed. R. Civ. P. 56 ....................................................................................................... 14

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

VELENCIA MAIDEN,                    )
                                    )
    Plaintiff,                      )
                                    )
v.                                  )        Case No. CIV-14-413-F
                                    )
THE CITY OF OKLAHOMA CITY, et al.,  )
                                    )
    Defendants.                     )

## DEFENDANT CITY'S BRIEF IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

**COMES NOW** a Defendant, the City of Oklahoma City and for its Brief in Support of its Motion for Summary Judgment, states:

## MATERIAL FACTS NOT IN DISPUTE

1.      Defendants Jeffery Dutton and Daniel Holtzclaw were employed by Defendant City as police recruits on September 16, 2011, and received police training at the OCPD Training Academy from that date until April 12, 2012, for a total of 1128 hours.  (Affidavit of Chief William Citty, Exhibit 1; Syllabus of OCPD Recruit Class #128, Exhibit 2; OCPD Policies 670.0, Training; and 670.10, Recruit Training; Policies 670.0-670.10, Exhibit 3; and OCPD Procedures 431.0, Recruit Academy; and 431.10, Major Grades; Procedures 431.0-431.10, Exhibit 4). Defendants Gregory Franklin and Mohammad Tabiai[1] were employed by the City as police recruits on May 28, 2012 and received police training at the OCPD Training Academy from that date until December 6, 2012, for a total of 1120 hours. (Syllabus of OCPD Recruit Class #129, Exhibit 5.

---

[1] This officer's name was misspelled in the Petition as "Tabaia."

Exhibits 1, 3, and 4.).

2.      At the time of these officers' training, State law required only 600 hours of law enforcement training to be commissioned, at least four of which had to instruct on "recognizing and managing a person appearing to require mental health treatment or services." 70 O.S. § 3311(E). OCPD recruits receive 8 hours of training on mentally ill/protective custody issues.  See entry on November 18, 2011, Exhibit 2, and on September 7, 2012, Exhibit 5.

3.      During their training academy, these officers received training in the following subjects that may be relevant to the issues in this case: Laws of Arrest;[2] Searching and Transporting Prisoners; Use of Force; Mentally Ill and Protective Custody; Observation and Perception Concepts; Concepts of Probable Cause; Human Relations; Introduction to Patrol; Maximal Restraint (the outline for this training is OCPD Procedure 154.30 and a video entitled "Hobble Restraint"); Custody and Control; and (then existing) OCPD Policies, Procedures and Rules.[3] (Copies of these outlines, Exhibits 6-15, respectively.  Exhibit 1.) The written outline on Mentally Ill and Protective Custody (Exhibit 9) states it is for 4 hours.  The OCPD presents the CLEET 4 hour classroom training and then an officer presents an additional 4 hours of training based upon various scenarios. (Exhibit 1.) There is no outline of these scenarios. Additionally, CLEET

---

[2] Defendant City denies that its officers were attempting to arrest Plaintiff's decedent. As shown by his 911 call, (see ¶ 25), the Plaintiff's decedent was a person "with mental issues." The officers were attempting to take him into protective custody pursuant to 43A O.S. § 5-207.

[3]There is no outline for OCPD Policies, Procedures and Rules. Instead, each recruit is given an electronic version of the OCPD Operations Manual which include all Policies, Procedures and Rules. The recruits were instructed straight from this manual. (Exhibit 1.)

updated the outline on Mentally Ill/Protective Custody between the time it was taught in

Classes 128 and 129 and therefore, both outlines are attached marked as Exhibit 9;

Exhibit 1.)

4.     Following their graduation from the Police Academy, the individual

Defendants, as do all OCPD recruits, received approximately four (4) months of

additional training with a Field Training Officer. (OCPD Policy 670.20, Field Training

and Evaluation Program, Exhibit 16; Procedures 434.0, Field Training Evaluation Unit;

and 434.10, Field Training Evaluation Program, Exhibit 17; Exhibit 1.)

5.     70 O.S. § 3311.4, effective 2008, requires that full-time police officers

attend and complete 25 hours of continuing law enforcement training every year,

including 2 hours on mental health issues. The OCPD's requirements are consistent with

this law. (OCPD Policy 670.30, In-Service Training, Exhibit 18; and OCPD Procedures

436.0, In-Service Training; and 436.05 Attendance, Exhibit 19.) Because these officers

graduated from the OCPD Recruit Academy after the phase I In-Service training was

provided in calendar year 2012, they did not attend that phase. They did attend in 2013.

(Exhibit 1.)

6.     Officer D. Holtzclaw attended 58 additional hours of In-Service training

since his graduation from the OCPD Recruit Academy through May 13, 2014.   (On

January 8, 2015, Holtzclaw was terminated due to unrelated issues.  Affidavit of Chief

Citty, Exhibit 1; letter to Holtzclaw, Exhibit 20; In-Service Training Record of Sgt.

Holtzclaw. The annual mental health training is included in the 1st phase of the In-Service

Training. Exhibits 22 and 23; Exhibit 1. The annual custody/control training is included

3

in the 2nd phase of the In-Service Training. Exhibit 24; Exhibit 1.)

7.    Officer Jeff Dutton has attended 240 additional hours of In-Service training since his graduation from the OCPD Recruit Academy through May 2014. (In-Service Training Record of Officer Dutton, Exhibit 25; Exhibits 22-24; Exhibit 1.)

8.    Officer Tabiai  has attended 54 additional hours of In-Service training from since graduation from the OCPD Recruit Academy through May 2014. (In service training record of Sgt. Tabiai, Exhibit 26; Exhibits 22-24; Exhibit 1.)

9.    Officer Gregory Franklin has received an additional 98 hours of In-Service training since his graduation from the OCPD Recruit Academy through May 2014. (In-Service training record of Officer Franklin, Exhibit 27; Exhibits 22-24; Exhibit 1.)

10.    Officers are issued copies of the OCPD Operations Manual, which contains current OCPD Policies, Procedures and Rules, upon their induction. Officers are directed to be familiar with the contents of it and to keep it updated with new policies, procedures and rules as issued.  (OCPD Policy 030.0, Review, Exhibit 28; OCPD Procedures 113.0, Issuance of Policies, Procedures and Rules; 113.10, Responsibility; 113.20, Distribution of the Operations Manual; and 113.30, Update of Operations Manual (Procedures 113.0-113.30, Exhibit 29; OCPD Rules 100.0, Compliance with Policies, Exhibit 30; and 105.0, Condition of Manual, Exhibit 31.  Exhibit 1.)

11.    In response to the Supreme Court's decision in *Tennessee v. Garner*, 471 U.S. 1 (1985), the City Council of the City (pursuant to § 43-4 of the Municipal Code)[4]

---

[4]Policies for the OCPD are adopted by the City Council. Procedures are set by the Chief. See § 43-4 of the Municipal Code.

enacted OCPD Policy 9.03. (Resolution of City Council dated July 16, 1985, Exhibit 32.) This Policy is now OCPD Policy 554.0-554.60. This policy also deals with the use of non-deadly force. (OCPD Policies 554.0-554.60, Exhibit 33; Exhibit 1.)[5]

12.    In 2001, the Tenth Circuit Court decided *Cruz v. City of Laramie, Wyoming,* 239 F.3d 1183 (10th Cir. 2001). While the Court did not decide that "hogtying" (defined by the Court as binding the ankles to the wrists of a detainee behind the detainee's back with 12 inches or less of separation) was unconstitutional in all applications, the Court held that "officers may not apply this technique when an individual's diminished capacity is apparent." *Id.* at 1188. When the OCPD was advised of this decision, the use of "hog-tying" was banned in July 2001.  (Exhibit 1.)  The OCPD does permit officers to place a subject into maximal restraints under limited circumstances, including when they continue to be combative or attempt to damage City property. The OCPD's maximal restraint procedure requires that a subject's hands and feet may only be temporarily bound together, with a minimum of 24 inches of separation, while a waist belt is being secured. OCPD policy requires that the subject be monitored while in maximal restraints and the use of this system must be reported. The maximal restraint system is further described in OCPD Procedure 154.30. (Exhibit 14; Exhibit 1.)

13.    In March 2007, the OCPD was accredited by the Commission on Accreditation for Law Enforcement Agencies, Inc., (CALEA).  This agency reviewed the various activities of the OCPD and found that the OCPD's use of force regulations are

---

[5]Defendant City denies that the officers used deadly force as is alleged by Plaintiff in ¶ 37 of the Amended Complaint.

thorough and require… an investigation by a supervisor of the next highest rank. (Chapter 1, p. 22 of CALEA's January 15, 2007 Assessment Report, Exhibit 34; Exhibit 1)  It further describes the review process for each use of force (*id.*).  They found the OCPD had a "very comprehensive Code of conduct" (p. 26 Chapter 26, Exhibit 34); an "emphasis on quality training" which was "very evident" (p. 27 Chapter 33, Exhibit 34) and states IA's investigations "are very thorough, well documented and consistent with agency directives…"  (Chapter 52 at p. 30.)  On March 27, 2010 and March 17, 2013, CALEA again awarded the OCPD Accreditation. (All 3 accreditation letters, attached as Exhibit 35; Exhibit 1.)

14.     In 2002, the OCPD adopted a crisis intervention program known as the "Memphis Model" to help officers better respond to calls involving mentally ill persons. Officer who are members of the crisis intervention team (CIT) receive 50 hours of additional training on dealing with the mentally ill. The training includes de-escalation techniques, diversion mechanisms, and collaboration with mental health care professionals. See *Wilson v. City of Chicago*, 2011 WL 1003780 *2 (N.D. Ill. 2011). Not all officers are CIT trained officers, however, all officers do receive training in responding to and dealing with individuals who are mentally ill. (Exhibit 1.)

15.     As of May 1, 2013, Defendant City had adopted the following police department Policies that may be relevant to Plaintiff's claims: 105.0, Mission Statement (Exhibit 36); 110.0, Primary Objective (Exhibit 37); 120.10, Apprehension of Offenders (Exhibit 38); 205.0, Standard of Conduct; 205.10, Law Enforcement Code of Ethics; 205.15, Oath of Office 205.0-205.15, Exhibit 39; 220.0, Respect for Constitutional Rights

6

(Exhibit 40); 285.0, Allegations of Employee Misconduct; 285.10, Objectives of Personnel Investigations (285.0-285.10, Exhibit 41); 287.0, Discipline (Exhibit 42); 505.0, Nature of Task (Exhibit 43); 510.0, Police Action Based on Legal Justification (Exhibit 44); 512.0, Alternatives to Physical Arrest or Detention (Exhibit 45); and 554.0, Use of Force – General; 554.10, Definitions; 554.20, Legal Requirements. (Exhibit 33; Exhibit 1.)

16. The OCPD has a specific procedure for responding to calls involving mental health issues. (OCPD Procedures 215.0-215.85, Exhibit 46; Exhibit 1.) The purpose of the procedure is to "provide for the humane care and treatment of persons who are mentally ill, alcohol dependent, or drug dependant."

17. The OCPD requires an investigation on any use of force beyond routine handcuffing. Because Plaintiff's decedent died while in protective custody, this incident was investigated by the OCPD Homicide Division pursuant to OCPD Procedures 150.0-150.02[6] and 150.18-150.31. (Exhibit 47.) Contrary to Plaintiff's Amended Petition, the OCPD investigation into each such incident in which a person dies while in police custody is presented to the District Attorney's office for that office's determination as to whether criminal charges are warranted against the involved officer(s). OCPD Procedure 150.18(K), Exhibit 47. Such review occurred here. (Letter of David Prater dated August 2, 2013, Exhibit 48 and Exhibit 1.) After that review, the incident is reviewed by the police administration to determine if the officer's actions complied with OCPD Policies

---

[6] Please note that Procedure 150.02(A) requires the officer to "Render first aid and/or summon medical attention." (Exhibit 47.)

and Procedures. OCPD Procedure 150.18(K) and 150.30; 150.14 and 160.40. (Exhibits 47 and 49; Exhibit 1.)

18.     The OCPD also maintains an Early Intervention Program, which requires a re-review of each use of force if an officer exceeds a certain number of uses of force in a certain time frame. OCPD Procedure 148.0, Early Intervention Program; 148.10, Criteria; 148.20, Responsibilities of the Office of Professional Standards; 148.30, Supervisor's Responsibilities; 148.40, Responsibilities of Division Commander; 148.50, Responsibilities of the Bureau Chief; and 148.60, Responsibilities of the Chief of Police. (Procedures 148.0 – 148.60, Exhibit 50; Exhibit 1.)

19.     Other OCPD procedures that are relevant to this incident include Complaints against Police Department Employee (OCPD Procedure 143.0, Exhibit 51); and procedures regarding discipline and retraining:  170.0, Disciplinary Action; 170.10, Verbal Counseling; 170.15, Transfer; 170.25, Progressive Disciplinary Actions; 170.30, Reprimands for Cause; 170.45, Probation; 170.50 Reduction of Salary Rate for Cause; 170.60, Demotion to a Designated Rank or Grade for Cause; and 170.70, Termination of Employment. (Procedures 170.0 – 170.70, Exhibit 52; Exhibit 1.)

20.     There are procedures regarding medical treatment: OCPD Procedures 150.02(A), Exhibit 47 and 233.0, Medical Treatment for Persons in Custody; 233.10, Hospital Selection Guideline; and 233.20, Injured Before Booking. (Procedures 233.0 – 233.20, Exhibit 53; Exhibit 1.)

21.     There are procedures regarding arrests: OCPD Procedure 230.0, Arrest Procedure; 230.10, When a Person Can be Arrested; 230.20, Hold for State Charges;

8

230.21, Felony Offense; and 230.22, Misdemeanor Offense.  (Procedures 230.0 – 230.22, Exhibit 54; Exhibit 1.)

22.     As of May 1, 2013, the OCPD had adopted Rules that may be relevant to Plaintiff's claims: OCPD Rule 120.0, Truthfulness/Cooperation (Exhibit 55); 348.0, Use of Force (Exhibit 56); and 470.0, Constitutional Rights (Exhibit 57; Exhibit 1.)

23.     The Council on Law Enforcement, Education, and Training must issue or approve all basic police training outlines. All OCPD recruit basic outlines are CLEET issued or approved. (Exhibit 1.)

24.     Defendant City's policy on Use of Force, and its training of its police officers on the use of deadly and non-deadly force, have been repeatedly upheld by Judges in this District. These cases include, but are not limited to, *Rios v. City of Oklahoma City, et al.*, CIV-87-2383-T; *Franklin v. Thompson, et al.*, CIV-89-1492-T; *Carr v. City of Oklahoma City, et al.,* CIV-01-124-C; *Grigsby v. City of Oklahoma City*, CIV-02-1220-F; and *Fuston-Lounds v. City of Oklahoma City, et al.*, CIV-03-1519-T. (Orders, Attachments A-E, respectively.)  In *Franklin*, the plaintiff only appealed the jury verdict in favor of the officer and not the ruling upholding the City's policies and procedures. This jury verdict was upheld. *Franklin v. Thompson*, 981 F.2d 1168 (10th Cir. 1992). In *Carr v. City,* Judge Cauthron upheld the City's written policies and training of officers on the use of deadly force. The plaintiff appealed and the Tenth Circuit affirmed in *Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003). In *Fuston-Lounds v. Torres, et al.,* the plaintiff alleged a failure to train in another deadly force case. The District Court granted the City Judgment. Ms. Lounds appealed and the Circuit Court affirmed in *Lounds v.*

*Torres,* 217 Fed. Appx.755 (10th Cir. 2007).

In *Coffee v. City of Oklahoma City, et al.,* CIV-08-239-W (Order, Attachment F), Judge West granted the City's dispositive Motion on the claim of ratification of the officer's use of "excessive" force. That plaintiff argued that because the OCPD, after the fact, investigated the officer's use of force and did not discipline him, it ratified the use of force. Judge West noted that the City's after-the-fact investigation could not be the direct causal link of the officer's use of force. (Pp. 10-11.)  See also *Cordova v. Aragon,* 569 F.3d 1183 (10th Cir. 2009).  Additionally, the OCPD did not believe plaintiff's "version" of the event, and therefore, the City could not have approved the "basis" for the event. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1986), and *Bryson v. City of Oklahoma City,* 627 F.3d 784,788 (10th Cir. 2010), *cert denied* _____ U.S._____, 131 S.Ct. 3030 (2011).

25.     Plaintiff has no knowledge of the OCPD's training of its officers or of its written policies. Deposition of Plaintiff, pp. 111-112. At ¶ 12 of the Amended Complaint, Plaintiff refers to the use of the Maximal Restraint Hobble System on her decedent but then, at ¶ 16, acknowledges that the Medical Examiner's office attributed the cause of the death of Clifton Armstrong to Excited Delirium Syndrome due to Methamphetamine Toxicity.[7] The Medical Examiner's report actually says the cause of death is "Acute Methamphetamine Toxicity." (Exhibit 58.)

26.     On May 1, 2013, at approximately 8:46:42 p.m., Plaintiff's decedent called

---

[7]The death of the plaintiff's decedent in *Cruz v. City of Laramie, Wyoming,* 239 F.3d 1183 (10th Cir. 2001) was caused by positional asphyxia, not Excited Delirium Syndrome. *Id.* at 1188-1189.

the City's 911 center and stated that he thought he lost his mind, he seen (sic) dragons, that people are following him; that dead people were following him; that he was on drugs, that he wanted to kill himself, and that his mother was the only person he trusted. He refused to answer any questions. Incident Detail report p. 2, Exhibit 59; 911 tape, Exhibit 60; Exhibit 1.)

27.     Plaintiff's decedent gave the call taker an address of 1449 NW 98th, but the "land" line he called from gave an address of 1421 NW 99th Street – Plaintiff's address. This call was assigned to Defendant Dutton at 8:59 p.m. with Defendant Tabiai assigned as backup at 9:08 p.m.  (Exhibit 59; Exhibit 1.)

28.     The Information given to 911 by Plaintiff's decedent was typed into the OCPD's Mobile Data Computer System and all officers could read what was typed in. (See p. 2 of the Incident Detail Report, Exhibit 59; Exhibit 1.)

29.     Both Plaintiff (the mother of the decedent) and Jean Griffin (the grandmother of the decedent) were present during part of this incident. Both completed third party affidavits/statements regarding the need to take the decedent into protective custody. See 43A O.S. § 5-207(C). (Affidavits, Exhibit 61; Exhibit 1.)[8]

---

[8]Plaintiff was asked to admit the truthfulness of statements made in these affidavits. She denied them. (Plaintiff's Response to Defendant City's Request for Admissions, Exhibit No. 62 at 19 and 20.)   At their depositions, both admitted that they filled out the affidavits.  (Deposition of Plaintiff, pp. 74; 105-107, and deposition of Griffin, pp. 58-61.) Please note that 43A O.S. § 5-207(C) and the affidavits refer to criminal sanctions for lying. In any event, under *Scott v. Harris,* 550 U.S. 372 (2007), a court is not required to ignore evidence made contemporaneously when Plaintiff later denies those "facts." Please also notice that Plaintiff, like her counsel in the Amended Petition, denies the finding of the Medical Examiner. (Exhibit 62, Response for Admissions at No. 18.  See also Ms. Griffin's deposition at p. 62.)

30.     Plaintiff and Ms. Griffin were interviewed by members of the OCPD Homicide Unit after this incident. Ms. Griffin told the investigator "I didn't see anything they done wrong. They were just trying to help him." She denied seeing any officer try to "hit punch, or kick Armstrong."  (Deposition of Griffin, p. 82; Exhibit 63.)  Both Ms. Griffin and Plaintiff attempted to assist the officers by holding the decedent's legs until Holtzclaw arrived and relieved them. (Video of interview of Ms. Griffin, Exhibit 63; Exhibit 1.)

31.     Plaintiff admitted that she told the decedent he was going to the hospital either with her or the police, that the police did not want the decedent to ride in her car because it was a 4 door and the police were afraid the decedent would jump out, and instead, to go with Ms. Griffin because her car was a 2 door.[9]  (Video of Interview of Plaintiff, Exhibit 64; Deposition of Griffin, p. 26.) He refused.  She stated the officers tackled the decedent;[10] that the officers got one handcuff on him, but were struggling to get the other on; that she (and Ms. Griffin) tried to assist by holding his legs; that the officers finally put something on his ankles[11] and made her and Ms. Griffin go into the house. She denied seeing the officers "hit, punch or kick Clifton."  When asked if she saw the officers do anything wrong, she said she did not see it and was not saying they did, however, she could not see it all because she was made to go into the house which was strange. (Exhibit 64; Exhibit 1.)   After this incident, Plaintiff had someone take

---

[9]The decedent would have to get into the back seat of the car.

[10]The evidence will be that the decedent got into a football stance and "rushed" one of the officers.

[11]Defendant Holtzclaw applied the hobble restraint because the Plaintiff's decedent was trying to kick the officers.

photos of herself depicting the position Armstrong was in at various times during this incident. Exhibit 70 is a photo that is a true an accurate representation of the position he was in after the hobble was applied.  (Deposition of Plaintiff, pp. 108-09, and deposition of Griffin, p.64.)  Ms. Griffin conceded his feet were more than 12 inches from his hands. (Deposition of Griffin, p. 64-65.)

## STATEMENT OF THE CASE

On April 2, 2014, Plaintiff filed an Amended Petition in the Oklahoma County District Court on behalf of her decedent.  The Defendants removed the case to this Court based on federal question jurisdiction. Plaintiff makes a whole host of allegations against the City under 42 U.S.C. § 1983 and Oklahoma State law, including ratification (¶¶ 14-15; 37i); excessive force under the Oklahoma Constitution (¶ 40); excessive force under the Fourth Amendment to the United States Constitution (¶ 36); failure to train (¶ 37a);[12] use of physical restraint and the hobble system (¶ 37b); apparent failure to discipline (¶ 37c); failure to monitor and evaluate performance of officers regarding use of force (¶ 37d and h); failure to adequately investigate citizen's complaints regarding deadly or unreasonable force (¶ 37 e and f); failure to provide medical attention to persons suffering from psychiatric conditions (¶ 37g); failure to adequately investigate officer involved incidents (¶ 37j) and a failure to seek criminal prosecution against officers whose behavior violates the law (¶ 37k).

---

[12] In subparagraph a, Plaintiff alleges that the City failed to train the officers in the use of deadly force. The Medical Examiner's report disputes any claim that deadly force was used. Further, the City's policies and training on the use of deadly force have been repeatedly upheld in this Court and the Tenth Circuit Court of Appeals. See ¶ 21 herein.

13

## STANDARD ON SUMMARY JUDGMENT

To succeed on a Motion for Summary Judgment, the moving party must establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. However, when the moving party has carried its burden, the nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts" and must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Thus, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issues of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986). "Material" facts are those "that may affect the outcome of the suit involving the governing law." *Id.* at 248. Furthermore, when an opposing party tells a story that is "blatantly contradicted by the record, so that no jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Lastly, summary judgment is appropriate where the moving party shows that the opposing party is unable to produce sufficient evidence in support of the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## ARGUMENT AND AUTHORITIES

### Proposition I: The Defendant Officers Did Not Commit a Constitutional Violation.

14

Plaintiff alleges that the defendant officers violated the Fourth Amendment by unlawfully seizing Mr. Armstrong and using excessive force to place him into custody. Amended Petition, ¶ 31. A municipality may not be held liable on a constitutional claim, regardless of what its policies authorize, if its employees did not commit a constitutional violation. *City of Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986). Here, the officers did not violate Plaintiff's decedent's constitutional rights because their actions in placing Mr. Armstrong into custody were reasonable.  In *Pino v. Higgs,* 75 F.3d 1461 (10th Cir. 1996), the Court held that the Fourth Amendment's reasonable seizure requirement applied to law enforcement taking a person into protective custody for a mental health evaluation.  Based upon the 911 call from Plaintiff's decedent, the third party affidavits from Plaintiff and the decedent's grandmother describing the Plaintiff's decedent's actions, there was probable cause to believe the Plaintiff was a danger to himself and others and he should have been taken into protective custody.  (Exhibits 60 and 61.)  43A O.S. §§ 1-103(13) and 5-207.

The Fourth Amendment governs claims of excessive force. *Graham v. Connor*, 490 U.S. 386 (1989). In determining whether the amount of force used to take an individual into custody was reasonable, the ultimate question "is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citations omitted). This standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

15

resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Courts should avoid unrealistically second guessing an officer's decisions and should instead evaluate a use of force from the perspective of a reasonable police officer on the scene who may be forced to make split second judgments. *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005).

The 10th Circuit has stated that it is "beyond dispute that the safety of law enforcement officers during the performance of their duties is a 'legitimate and weighty' concern." *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977)). Officers "may use force during a Terry-type detention to the extent that 'such steps [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Id.* (citing *U.S. v. Hensley*, 469 U.S. 221, 235 (1985)). Those steps may include, (if necessary to protect their safety), drawing their weapon, placing a suspect in handcuffs, or forcing a suspect to the ground. *Id.* Additionally, "the Fourth Amendment 'does not require [police] to use the least intrusive means in the course of a detention, only reasonable ones.'" *Marquez*, 399 F.3d at 1222 (quoting *U.S. v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994).

In *Rojas ex. rel. Rojas-Ramirez v. Anderson*, 2012 WL 2153941 (D. Colorado June 13, 2012), the plaintiff claimed that two police officers used excessive force when they pulled him from a police car and placed him in hobble restrains because he would not stop kicking. *Id.* at *4. The court found that the officers' action were reasonable based on the factors articulated in *Graham v. Connor. Id.* at *5. First, the crime Rojas was

suspected of – kicking an officer earlier in the interaction – was serious. *Id.* Second, the officers had reason to fear for their safety and the safety of others because Rojas had "been uncooperative through the encounter with police" and was kicking the car window. *Id.* Third, Rojas was actively resisting his initial arrest, although he claimed that he was not resisting when the officers pulled him from the vehicle. *Id.* The court concluded that under the totality of the circumstances, the officers' actions were reasonable because they "were faced with an uncooperative arrestee who was kicking forcefully at the door of the patrol car and who had already succeeded in kicking [an officer], despite being handcuffed. And the use of a hobble restraint is not per se unreasonable." *Id.*

Like in *Rojas*, the officers' actions in subduing and placing Mr. Armstrong in hobble restrains was a reasonable use of force given that they were faced with an uncooperative individual who charged at an officer, resisted attempts to take him into protective custody, and would not stop kicking or resisting. Based on the situation confronting the officers, their actions in placing Mr. Armstrong into custody were objectively reasonable and the officers did not violate Plaintiff's decedent's Fourth Amendment rights.  Under *Heller*, Defendant City cannot be held liable regardless of what its policies authorize.

### Proposition II: Defendant City's Policies, Procedures, and Customs are Constitutional.

In a § 1983 action, a municipality may only be held liable "for its own unconstitutional or illegal policies" and not merely because its employee injured the plaintiff. *Barney v. Pulsipher,* 143 F.3d 1299, 1308 (10th Cir. 1998). A municipal policy

or custom must be the "moving force" behind a constitutional injury in order to impose municipal liability. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 690-95 (1978). The challenged policy must also be "closely related to the violation of the plaintiff's federally protected right." *Schneider v. City of Grand Junction Police Department*, 717 F.3d 760, 770 (10th Cir. 2013) . Proof of a single incident of unconstitutional activity is not sufficient to impose liability on a municipality where the policy relied on is not itself unconstitutional. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). Defendant City's policies and training regarding use of force, discipline, and providing medical care are constitutional and could not have been the direct cause of any alleged constitutional violation. Defendant City maintains policies regarding use of force, (Exhibit 33), the use of restraint systems, (Exhibit 14), responding to situations that involve persons suffering from mental illness, (Exhibit 46), and providing medical attention. (Exhibit 47).     Consistent with the constitutional standard articulated in *Graham v. Connor*, Defendant City's policy regarding use of force states that officers may only use the amount of force that is "objectively reasonable" in light of the facts and circumstances as a reasonable officer would perceive them to be at the time of the incident. Defendant City's procedures for dealing with individuals who appear to be suffering from mental illness state that a person may only be placed into protective custody if the person poses an immediate likelihood of serious harm to self or others. Defendant City's policies also state an officer's first priority is to ensure that medical attention is received as rapidly as possible whenever an arrested person requires medical attention. All of these policies comply with constitutional requirements and Plaintiff has

no evidence that any of the policies could have caused a violation of Plaintiff's decedent's constitutional rights.

Regarding the use of restraint systems, the OCPD prohibited "hog tying" in response to the decision in *Cruz v. City of Laramie, Wyoming*, 239 F.3d 1183 (10th Cir. 2001). "Hog tying" involves binding a detainee's ankles to wrists behind his back with 12 inches or less of separation. *Id.* OCPD Procedure 154.30 permits officers to use a maximal restraint system on subjects who continue to be combative. The maximal restraint or "hobble" system involves securing a subjects handcuffs and leg restraints to a belt around the subject's waist. OCPD officers are instructed on the difference between "hog-tying" and "hobbling" a subject.  Officers are instructed, pursuant to OCPD policy, that a subject's hands and feet may only be temporarily attached, with a minimum of 24 inches of space between the hands and feet, while the waist belt is being attached. (Procedure 154.30, Exhibit 14).   Plaintiff has submitted an "expert" witness report (Exhibit 69) which miscalculates the length of OCPD Class 129 classroom instruction (Exhibit 69 at p. 10; it was 28 weeks and not 18 weeks, Exhibit 5) and ignores OCPD Procedure 154.30 and OCPD Custody and Control Outline when he opines that the OCPD offered no training on excited delirium (Exhibit 69 at pp. 2 and 9.  See Exhibit 15 at pp. 41-42, which discusses Sudden Custody Death Syndrome and pp. 43-44, which discusses Cocaine Induced Excited Delirium.)   Plaintiff also misrepresents the Courts opinion in *Cruz* by repeatedly referring to a "hog-tie" manner of "maximal restraint." (See pp. 9 and 10.)  An "expert" witness opinion is not sufficient to establish a question of material fact.  See *Carr v. Castle*, 337 F.3d 1221, 1230 (10th Cir. 2003).  In any event,

an "expert" witness who ignores (or does not have) all the facts is not credible and should be ignored.  This expert claims to be an expert in positional asphyxia, but there is no evidence that Mr. Armstrong died as a result of a lack of oxygen.  Further, ignoring the Supreme Court's and Tenth Circuit's admonishment not to consider less intrusive alternatives, this expert repeatedly opinions the officers should have used a taser.  This opinion should be ignored.  OCPD policy also requires that any subject placed in maximal restraints must be continually monitored for any signs of physical distress. Officers are only permitted to use maximal restraints when a subject cannot be controlled with handcuffing alone and is continuing to be combative. Federal Appellate Courts have upheld the use of maximal restraints or "hobble" restraints on uncooperative or resisting subjects under the Fourth Amendment. See for example, *Garrett v. Athens-Clarke County, Ga,* 378 F.3d 1274 (11th Cir. 2004); *Gunter v. Township of Umberton,* 535 Fed. Appx. 144 (3rd Cir. 2013). The OCPD's policy regarding the use of the maximal restraint or hobble system is constitutional and could not have been the cause of any of Plaintiff's decedent's alleged constitutional injuries.

Plaintiff also attempts to allege that the City had a de facto custom of condoning illegal and unconstitutional behavior by its officers. Amended Petition, ¶ 37. Again, Plaintiff has no proof of this claim. The OCPD has an extensive investigation and review process regarding the use of force and complaints lodged against police department employees. A supervisor investigates each use of force and the use of force is reviewed by a screening committee. (OCPD Procedures; 150.0 *et seq.*, Exhibit 47; 160.40, Exhibit 48.)  In death cases, the District Attorney and the OCPD's Professional Standard Division

each conduct their own review of the use of force. (Exhibit 48.) The OCPD also investigates and reviews each citizen complaint that is filed against an employee. (OCPD Procedure 143.0, Employees, Exhibit 51.) The OCPD has an early intervention program to identify any officers that may have a pattern of behavior regarding uses of force. (OCPD Procedure No. 148.0, Exhibit 50.)   Finally, Defendant City has policies and procedures regarding discipline of officers. (OCPD Policy No. 287.0, Exhibit 42; Procedure 170.0, Exhibit 52; Rule 205.0, Exhibit 65.) The investigation and review process negate any claim that the City was deliberately indifferent or that it had a custom of condoning the use of excessive force.  (Exhibit 47.)[13]

Plaintiff has no proof that the officers involved in this incident were aware of any claimed deficient custom or that the custom directly caused the use of force in this case. In *City of St. Louis v. Praprotnik*, 485 U.S. 112(1988), the Supreme Court stated:

> Municipal liability may be based on a formal regulation or policy statement, or it may be based on an informal "custom" so long as this custom amounts to "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'"

*Id.* at 117. Plaintiff cannot meet the high standard described in *Praprotnik* because she has no proof that the OCPD has any "widespread practice" other than what its written policies describe.

Defendant City policies are constitutional and there is no evidence that it

---

[13] Such measures are not constitutionally required. See *Wilson v. Meeks,* 52 F.3d 1547, 1557 (10th Cir. 1995), remanded on other grounds and affirmed, 98 F.3d 1247 (10th Cir. 1996).

maintains any unlawful "custom."

### Proposition III: Defendant City's Training and Supervision of its Police Officers is Constitutional.

Plaintiff alleges that Defendant City failed to properly train its officers regarding use of force and failed to properly discipline and/or supervise its police officers. Further, Plaintiff alleges that these failures somehow caused her decedent's constitutional rights to be violated. Amended Petition, ¶ 37. Notably, a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, __ U.S. __, 131 S. Ct. 1350, 1359 (2011). Indeed, a municipality's decisions regarding training will rise to the level of an official government policy for purposes of § 1983 only in limited circumstances. *Id*.

In *Canton v. Harris*, 489 U.S. 378, 388 (1989), the Supreme Court held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to a deliberate indifference to the constitutional rights of persons with whom the police come into contact." The Court further stated:

> In resolving the issue of a city's liability, the focus must be on the adequacy of the training program in relating to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. See *Springfield v. Kibbe,* 480 U.S. at 268 (O'Connor, J., dissenting); *Oklahoma City v. Tuttle, supra,* at 821 (opinion of Rehnquist, J.). It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove than an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they

22

> must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*Id.* at 390-91.

When a plaintiff alleges a failure to train constitutional claim, he must prove that the training was, in fact, inadequate as well as:

> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situations [sic] with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the party [sic] of the City toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003). Regarding the element of deliberate indifference on the part of the City, the Court stated:  "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."  *Id.* at 1229 (quoting *Barney v. Pulsipher,* 143 F.3d 1299, 1307-08 (10th Cir. 1998). Similarly, a "wrongful supervision" claim would require proof of deliberate indifference on the part of the municipality. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 789-90 (10th Cir. 2010) (holding that the City could not be liable for its failure to train or supervise one of its forensic chemists unless the municipal policymakers "can reasonably be said to have been deliberately indifferent to the need" for further training or supervision, citing *City of Canton*, 489 U.S. at 390.)

Deliberate indifference is "a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence of his action." *Connick,* 131 S. Ct. at 1359-60 (quoting *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). A municipality must have "notice that a course of training is deficient in a particular respect," which usually requires proof that there was a "pattern of similar constitutional violations by untrained employees." *Id.* at 1360.

Lastly, regarding Plaintiff's failure to discipline claim, a failure to discipline can only be actionable if it precedes the alleged constitutional injury. *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009)(stating that "As for any failure to discipline [the police officer], basic principles of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation." (emphasis in original)).

The City trains its officers on the constitutional limits of the use of force, providing medical care, and interacting with mental health patients. The individual Defendant Officers received 1120 or more hours of training during their police recruit academy. The recruit is instructed that he may use only the minimal amount of force necessary to accomplish the arrest; that no amount of physical force will be used on a suspect taken into custody (Exhibits 33 and 56); and on when restraint systems may be used. (Exhibit 14.) Instruction is provided on when a person may be lawfully arrested or when a person may be taken into protective custody. (Exhibits 46 and 54.) They are trained to provide medical care to a person injured while being taken into custody. (Exhibits 53.) They receive training on interacting with mental health patients. (Exhibit 46.) After graduating the police academy, recruits receive "in the field" training.

Additionally, OCPD Officers receive at least two hours of annual in-service training on dealing with mental health calls and officers who are members of the crisis intervention team receive 40 additional hours on dealing with mentally ill persons.

Based on this training, Plaintiff is unable to prove that Defendant City's training is inadequate, that it was deliberately indifferent to a known or obvious risk regarding its training, or that any deficiency in the training was a direct cause of any alleged constitutional violation concerning Plaintiff's decedent.

Plaintiff is also without any evidence indicating that Defendant City failed to appropriately discipline or supervise its officers or that this alleged fault directly contributed to a violation of her decedent's constitutional rights. The City has policies and procedures in place to ensure that OCPD officers are qualified and all officers are appropriately supervised. (Exhibits 66-68 and 49.) The City also has policies in place regarding the discipline of its officers. (Exhibit 42.) There is no evidence suggesting that Defendant City failed to appropriately discipline or supervise its police officers or that such a failure actually caused a deprivation of Plaintiff's decedent's constitutional rights. There is also no evidence suggesting that Defendant City was aware of or should have been aware of some widespread custom of failing to appropriately discipline or supervise its officers and was deliberately indifferent to the need for further supervision.

Defendant City respectfully requests the Court grant it Summary Judgment on all of Plaintiff's 42 U.S.C. § 1983 claims.

### Proposition IV: Defendant City Cannot be Liable on Plaintiff's State Law Claims.

Plaintiff apparently seeks to hold the City liable under state law based on *respondeat superior* by alleging that the defendant officers committed intentional infliction of emotional distress and/or or an assault and battery on Plaintiff's decedent. Amended Petition, ¶¶ 21-22, 27-29. Plaintiff's Assault and Battery claims allege that the officers acted "with malicious intent and without justification," Amended Petition, ¶ 12. Liability of a political subdivision on state law claims is governed by the Governmental Tort Claims Act, 51 O.S. §§ 151-172. The GTCA provides that a municipality may only be liable for the actions of employees that occur in the scope of their employment. 51 O.S. § 153.

Oklahoma courts have ruled that a municipality cannot be liable for intentional infliction of emotional distress as a matter of law because this tort requires proof of a malicious act that necessarily places it outside the scope of an employee's employment. *Parker v. City of Midwest City*, 1993 OK 29, 850 P.2d 1065; *McMullen v. City of Del City,* 1996 OK CIV APP 46, 920 P.2d 528. Similarly, the City cannot be liable on Plaintiff's assault and battery claims because her allegations of "malicious intent" place the officers' actions outside the scope of their employment. *Id.*

To the extent Plaintiff alleges that the officers' action were negligent, the City cannot be liable because it is immune under the GTCA. The GTCA exempts a political subdivision from liability for losses resulting from "the failure to provide, or the method of providing, police, law enforcement or fire protection." 51 O.S. § 155(6). The Tenth Circuit Court has ruled that pursuant to *Schmidt v. Grady County,* 1997 OK 92, 943 P.2d 595, a political subdivision is immune from liability under the GTCA for acts committed

26

by law enforcement personnel while attempting to take a person into protective custody. *Myers v. Oklahoma County Board of County Commissioners,* 151 F.3d 1313, 1320-21 (10th Cir. 1998).

In *Schmidt*, 1997 OK 92, 943 P.2d 595, the Oklahoma Supreme Court held that 51 O.S. § 155(6) immunized a political subdivision from liability for injuries sustained by a person who was taken into protective custody by an officer in order to protect the person from harming herself or others. The Court stated:

> …in the facts presented to this Court, the Grady County deputy sheriff was acting as a police officer in relation to the plaintiff. The deputy was providing police protection to the plaintiff and public when she jumped or fell from the patrol car. Thus any injury suffered by the plaintiff was a result of the county's method of providing police protection making the county immune from suit.

*Id.* at 598.

*Prichard v. City of Oklahoma City*, 1999 OK 5, 975 P.2d 914, also discussed the protection afforded under § 155(6). There, the plaintiff was injured prior to being taken into police custody and was transported to jail. *Id*. at 917. Although the officer took the initial step of taking Prichard to the emergency room for medical care, he failed to provide appropriate follow up treatment. *Id*. The Court held that the officer's failure to supply appropriate medical care was not a part of the "method of providing police protection" and therefore the City was not exempted from liability under § 155(6). *Id*. The Court distinguished this case from its earlier precedent by noting that "Prichard was neither taken into custody for his own protection nor injured while in police custody, as was the case in *Schmidt*." *Id*. Rather, Prichard was under arrest for a crime when he was

27

taken into custody and transported to jail. *Id.*

*Salazar v. City of Oklahoma City,* 1999 OK 20, 976 P.2d 1056, elaborated on the difference between a municipality's immunity for providing protective services and their liability for negligently carrying out law enforcement activities. The Court explained that "*Schmidt deals not with an arrestee but with a person in need of protection from harming herself or others*...Rather than carrying out a law enforcement function, the officer in *Schmidt* was *protecting a woman from the consequences of her disturbed mental state*." *Id.* In contrast, the plaintiff in *Prichard* was "neither taken into custody for his own protection, nor was he harmed in police custody." *Id.*

As in *Schmidt*, the officers in this case were providing the Plaintiff's decedent with protective services when they attempted to take him into custody. See 43A O.S. § 5-207. The officers were not attempting to arrest him, but were instead detaining him for his own protection and the protection of those around him. (See also Exhibit 61.) OCPD Procedure 215.60 states that "If the officer(s) after viewing the actions of the person, or after receiving information from a third party, has reason to believe the person is mentally ill and appears to be a danger to themselves or other, the officer will take the person into protective custody." (Exhibit 46.)

The Plaintiff's decedent was taken into custody for his own protection pursuant OCPD Procedure 215.60. (Exhibit 46.)  The Plaintiff's decedent was not an arrestee, but was instead a person in need of protection from harming himself and others. Accordingly, the City is immune pursuant to 51 O.S.§155(6).

**Proposition V: Defendant City Cannot be Liable on**

28

**Plaintiff's State Constitutional Claim.**

Plaintiff claims that the City is liable for the defendant officers' alleged use of excessive force pursuant to Okla. Const. art. 2, § 30, which states "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches or seizures shall not be violated…" In *Bosh v. Cherokee County Governmental Building Authority*, 2013 OK 9, 305 P.3d 994, the Oklahoma Supreme Court held that this Article provides a prison detainee with a private cause of action for excessive force, notwithstanding the exemption in the GTCA that immunizes jails/correctional facilities from liability under state law.

However, the Oklahoma Supreme Court recently held that a *Bosh* claim "for excessive force, as applied to police officers and other law enforcement personnel, may not be brought against a municipality when a cause of action under the OGTCA is available." *Perry v. City of Norman*, 2014 OK 119, ¶ 1, 341 P.3d 689. The Court reasoned that the cause of action created by *Bosh* under the Oklahoma Constitution should not extend to include situations where a plaintiff could have brought a claim against a municipality under the GTCA. *Id.* at ¶¶ 17-19. The Court stated that "employer liability for police officer's alleged excessive force conduct under the OGTCA is well settled" and "the plaintiff's remedy belongs exclusively within the confines of the OGTCA and a jury's determination concerning whether the police officers were acting within the scope of their employment under the OGTCA." *Id.* at ¶ 19.

Because Plaintiff could have brought a claim for excessive force against the City under the Governmental Tort Claims Act, her only state law cause of action should be

governed by the GTCA. As explained above in proposition IV, Defendant City cannot be held liable on this claim pursuant to 51 O.S. § 155(6).

Additionally, the factual statement in Plaintiff's Amended Petition asserts that the officers "used force to restrain and subdue" Mr. Armstrong with "malicious intent." The Court in *Bosh* repeatedly stated that the employee must be acting in the scope of his employment before the employer could be responsible. Such malicious intent places the officers' actions outside the scope of their employment and precludes liability for the City. Amended Petition, ¶ 12.

## CONCLUSION

**WHEREFORE**, Defendant City respectfully requests that the Court grants its Motion for Summary Judgment as there is no genuine dispute of any material fact and the City is entitled to judgment as a matter law.

Respectfully submitted,

KENNETH JORDAN
Municipal Counselor

By:     /s/ Richard C. Smith
        Richard C. Smith, OBA #8397
        Jennifer M. Warren, OBA #30284
        Assistant Municipal Counselors
        200 N. Walker, Suite 400
        Oklahoma City, OK 73102
        (405) 297-2451 Fax: (405) 297-3851
        Attorneys for Defendant City
        rick.smith@okc.gov
        jennifer.warren@okc.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of May, 2015, I electronically transmitted the attached Defendant City's Brief in Support of its Motion for Summary Judgment to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants. Ed Bonzie, 8201 South Walker, Oklahoma City, OK 73139, Attorney for Plaintiffs and to Susan Knight, One Leadership Square, Suite 800N, 211 North Robinson Avenue, Oklahoma City, OK 73102, Attorney for Defendant Officers.


/s/ Richard C. Smith

Y:\Maiden, Velencia v. City, et al. - CJ-2014-107\MSJ & Brf In Support.docx

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

VELENCIA MAIDEN,                          )
                                          )
      Plaintiff,                      )
                                          )
v.                                        )     Case No. CIV-14-413-F
                                          )
THE CITY OF OKLAHOMA CITY, et al.,        )
                                          )
      Defendants.                     )

## DEFENDANT CITY'S INDEX TO EXHIBITS AND ATTACHMENTS TO ITS
## BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

EXHIBITS

1.     Affidavit of Chief Citty

2.     OCPD Recruit Class Syllabus #128

3.     OCPD Policies 670.0 – 670.10, Training

4.     OCPD Procedures 431.0 – 431.10, Recruit Academy

5.     OCPD Recruit Class #129

6.     OCPD Training Outline - Laws of Arrest

7.     OCPD Training Outline - Searching and Transportation of Prisoners

8.     OCPD Training Outline - Use of Force

9.     OCPD Training Outline – Mental Illness and Protective Custody

10.    OCPD Training Outline - Observation and Perception

11.    OCPD Training Outline - Probable Cause

12.    OCPD Training Outline - Human Relations

13.    OCPD Training Outline – Patrol

14.     OCPD Procedure 154.30, Maximal Restraint, and Hobble Restraint Video

15.     OCPD Training Outline - Custody and Control

16.     OCPD Policy 670.20, Field Training and Evaluation Program

17.     OCPD Procedures 434.0 – 434.10, Field Training Evaluation Unit

18.     OCPD Policy 670.30, In-Service Training

19.     OCPD Procedures 436.0 – 436.05, In-Service Training

20.     Defendant Holtzclaw Termination Letter

21.     Defendant Holtzclaw In-Service Record

22.     OCPD In-Service Outline Mental Health 2013

23.     OCPD In-Service Outline Mental Health 2014

24.     OCPD In-Service Outline Custody/Control 2013-2014

25.     Defendant Dutton In-Service Record

26.     Defendant Tabiai In-Service Record

27.     Defendant Franklin In-Service Record

28.     OCPD Policy 030.0, Review

29.     OCPD Procedures 113.0 – 113.30, Issuance of Ops Manual

30.     OCPD Rule 100.0, Compliance with Policies, Procedures and Rules

31.     OCPD Rule 105.0, Condition of Manual

32.     OCPD Use of Force Resolution of City Council dated July 16, 1985

33.     OCPD Policies 554.0 – 554.60, Use of Force

34.     CALEA's January 2007 Assessment Report

35.     CALEA's 2013, 2010 and 2007 Accreditation Letters

36.     OCPD Policy 105.0, Mission Statement

37.     OCPD Policy 110.0, Primary Objective

38.     OCPD Policy 120.10, Apprehension of Offenders

39.     OCPD Policies 205.0 – 205.15, Standard of Conduct

40.     OCPD Policy 220.0, Respect for Constitutional Rights

41.     OCPD Policies 285.0 – 285.10, Employee Misconduct

42.     OCPD Policy 287.0, Discipline

43.     OCPD Policy 505.0, Nature of Task

44.     OCPD Policy 510.0, Police Action Based on Legal Justification

45.     OCPD Policy 512.0, Alternatives to Physical Arrest

46.     OCPD Procedures 215.0 – 215.85, Mental Health

47.     OCPD Procedures 150.0 – 150.02 and 150.18 – 150.31, Use of Force Investigation

48.     Letter from Prater Dated August 2, 2013

49.     OCPD Procedures 160.0 – 160.90, Departmental Boards and Committees

50.     OCPD Procedures 148.0 – 148.60, Early Intervention Program

51.     OCPD Procedure 143.0, Complaints against Police Department Employees

52.     OCPD Procedures 170.0 – 170.70, Disciplinary Action

53.     OCPD Procedures 233.0 – 233.20, In-Custody Medical Treatment

54.     OCPD Procedures 230.0 - 230.22, Arrest Procedure

55.     OCPD Rule 120.0, Truthfulness/Cooperation

56.     OCPD Rule 348.0, Use of Force

57.    OCPD Rule 470.0, Constitutional Rights

58.    Medical Examiner's Report

59.    OCPD Incident Detail Report

60.    OCPD 911 calls

61.    3rd Party Affidavits of Griffin and Maiden

62.    Plaintiff's Response to City's Request for Admissions

63.    Video Interview of Griffin

64.    Video Interview of Plaintiff

65.    OCPD Rule 205.0, Disciplinary Actions

66.    OCPD Policies 665.0 – 665.30, Personnel

67.    OCPD Procedures 424.0 – 424.50, Recruiting and Employment of Sworn Personnel

68.    OCPD Policy 528.0, Field Supervision

69.    Plaintiff's Expert Witness Report

70.    Photo of Plaintiff's recreation of decedent's positioning

ATTACHMENTS

A.     Order, *Rios v. City of OKC, et al.*, CIV-87-2383-T

B.     Order, *Franklin v. Thompson, et al.*, CIV-89-1492-T

C.     Order, *Carr v. City of OKC, et al.*, CIV-01-124-C

D.     Order, *Grigsby v. City of OKC*, CIV-02-1220-F

E.     Order, *Fuston-Lounds, et al. v. Torres, et al.*, CIV-03-1519-T

F.     Order, *Coffee v. City of OKC*, CIV-08-239-W

DEPOSITIONS

Deposition of Plaintiff – title page, 74, 105, 106, 107, 108, 109, 111, 112

Deposition of Jean Griffin – title page, 26, 58, 59, 60, 61, 62, 64, 65, 82