Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

VELENCIA MAIDEN, as Personal )
Representative of the        )
Estate of CLIFTON DARNELL    )
ARMSTRONG, deceased,         )
                             )
            Plaintiff,       )
                             )
VS.                          )  Case No. CIV-14-413-F
                             )
THE CITY OF OKLAHOMA CITY,   )
OKLAHOMA; JEFFREY DUTTON,    )
individually; GREGORY        )
FRANKLIN, individually;      )
MOHAMMED TABAIA,             )
individually; DANIEL         )
HOLTZCLAW, individually,     )
                             )
            Defendants.      )

DEPOSITION OF JEAN GRIFFIN
TAKEN ON BEHALF OF THE DEFENDANTS
IN OKLAHOMA CITY, OKLAHOMA
ON MAY 5, 2015

REPORTED BY:  DAVID BUCK, CSR

1  me.  Then he said he wanted to ride in his mother's
2  car because my car only had two doors and I wanted
3  him to go in my car because it had two doors.  I
4  forgot her car had child locks.  And so we were just
5  standing there, just standing.
6       Q.   Why did the fact that your car had two
7  doors on it have any bearing on which car you wanted
8  him to go in?
9       A.   My car was a two door car.  It was a
10 Hyundai, black Hyundai.  What did you say?
11      Q.   Why did it matter how many doors were on
12 the car?
13      A.   After we got in my car and changed his
14 mind, he was in the backseat, he couldn't get out.
15      Q.   Okay.
16      A.   Before we got to the hospital.
17      Q.   What hospital did you plan on taking him
18 to?
19      A.   I planned on taking him down to St.
20 Anthony's.
21      Q.   They have a mental healthcare --
22      A.   Yes.
23      Q.   -- part of their hospital?
24      A.   Yes, they do.
25      Q.   Okay.  Had you ever taken him there before?

1  are trying to kill him and his mother is the only
2  person that he can trust.  Won't answer any
3  questions.
4           Do you see that?
5      A.   Yes, I see it.
6      Q.   Does that sound like a person who is acting
7  normal to you?
8      A.   No.
9      Q.   Okay.  You told Ms. Knight that after this
10 incident you didn't sign anything.
11     A.   I don't remember signing anything.
12          (Defendant's Exhibit Number 3 marked for
13           identification purposes and made part of
14           the record.)
15     Q.   (By Mr. Smith) Okay, I'm going to hand you
16 what's been marked as Defendant's Exhibit Number 3
17 and ask you if you recognize this document.
18          MR. BONZIE:  Is this mine?
19          THE WITNESS:  Yeah, I recognize it but I
20 don't remember doing this.
21     Q.   (By Mr. Smith) But that is your signature.
22 Right?
23     A.   Yeah, that's my writing.  I don't remember
24 doing it.
25     Q.   Okay.  It's your signature.  Correct?

Jean Griffin

Page 59

1     A.    Yes.
2     Q.    Okay.  And it is your handwriting?
3     A.    Yes.
4     Q.    Did anybody tell you what to write?
5     A.    I don't remember doing it, so I don't
6  remember.
7     Q.    Okay.  Well, it looks like it says,
8  statement of observation, describe activity or
9  incident personally observed.  He was thinking
10 someone was going to kill him or someone was after
11 him.  He was paranoid hallucinate.
12           Did I correctly read that?
13    A.    Yeah.  Somebody had to spell it for me.
14    Q.    But you wrote that?
15    A.    Yeah.
16    Q.    And you were talking about your grandson?
17    A.    Yes.
18    Q.    So he was paranoid?
19    A.    Yes.
20    Q.    And he was hallucinating?
21    A.    I guess he was.  But I didn't see any of
22 that.
23    Q.    So, when this document says statement of
24 observation, describe activity or incident personally
25 observed, you didn't see any of this, you're lying on

Jean Griffin

Page 60

1   this document?
2      A.   I didn't see him act that way.  No, I'm not
3   lying.  But the state he was in, that would reflect
4   that he was paranoid.
5      Q.   Okay.  If you look down in the next to the
6   last line it says, I, the undersigned, attest to the
7   above statement to be factual and true to the best of
8   my knowledge and that I will testify to it and above
9   in the court.
10        Do you see that?
11     A.   Yes.
12     Q.   Did you know that at the time?
13     A.   No.
14     Q.   So was it a lie?
15     A.   No.  What I said up there is not a lie.
16     Q.   Okay.  And then the next line is, any false
17  statement given to the officer by the person upon
18  whose estimate the officer relies shall be a
19  misdemeanor and subject to the sanctions of Title 21
20  of the Oklahoma state statutes.
21        Did anybody tell you it's perjury if you
22  make a false statement on this document?
23     A.   No.  But I should have read it but I
24  didn't.
25     Q.   Okay.  Is it a lie?

Jean Griffin

Page 61

1      A.   It's not a lie.
2      Q.   Okay.  Do you know what your grandson died
3 of?
4      A.   A big word.  I don't know what he died of,
5 but I -- I don't know what he died of really.
6      Q.   Okay.
7      A.   Now, that's not a lie either.
8           (Defendant's Exhibit Number 4 marked for
9           identification purposes and made part of
10          the record.)
11     Q.   (By Mr. Smith) Okay.  I'm going to hand you
12 what's been marked as Defendant's Exhibit Number 4,
13 which is the medical examiner's report on your
14 grandson.  Have you ever seen that document?
15     A.   No, because I didn't look at them.
16     Q.   Okay.  If you look at about three-quarters
17 of the way down it says probable cause of death.  Do
18 you see where I'm talking?  Right here, ma'am.
19 Probable cause of death.
20     A.   Oh, okay.
21     Q.   Do you see what the medical examiner opined
22 caused his death?
23     A.   What is that?
24     Q.   Acute methamphetamine toxicity.  He
25 overdosed on meth.

Jean Griffin

Page 62

1    A.    I don't believe it.
2    Q.    Okay.  That's exactly the answer I was
3  looking for.  You don't agree with it.  Right?
4    A.    I don't believe it.
5    Q.    Okay.  What evidence do you have to prove
6  that that's not true?
7    A.    I don't have no evidence.
8    Q.    Okay.  If you'll look on the second page,
9  second page.
10   A.    Second page.
11   Q.    Cause of death, big bold letters, acute
12 methamphetamine toxicity.
13         Do you see that right here?
14   A.    Yes.
15   Q.    Don't believe it.  Right?
16   A.    I don't believe it.
17   Q.    Okay.  Do you see anywhere that they opined
18 that he died because he was hogtied?
19   A.    No.
20   Q.    Okay.  What's your definition of hogtied?
21   A.    When your hands are behind you and they
22 bring your feet up behind you.
23   Q.    Okay.
24   A.    And tie them together.
25   Q.    Do you know there's a case that gives a

Jean Griffin

Page 64

1  completely done and his hands and feet were less than
2  12 inches apart?
3       A.   No.
4       Q.   Is hogtied your word or your lawyer's word?
5            MR. BONZIE:  Objection to the form of the
6  question.
7       Q.   (By Mr. Smith) Is hogtied your word?
8       A.   What you mean by that because I said it?
9       Q.   I asked you, what does hogtied me to you?
10      A.   That would be hogtied to me.
11      Q.   Okay.
12           (Defendant's Exhibit Number 5 marked for
13           identification purposes and made part of
14           the record.)
15      Q.   (By Mr. Smith) I'm going to hand you what's
16  been marked as Defendant's Exhibit Number 5.  These
17  purport to be pictures provided by your attorney to
18  us and I assume that's your daughter on the top.  Is
19  that your daughter?
20      A.   Yes.
21      Q.   And I presume that she's trying to describe
22  for the person who is taking the picture the position
23  that your grandson was in.
24      A.   Yes.
25      Q.   Does that look like less than 12 inches to

Jean Griffin

Page 65

1  you between the hands and the feet?
2      A.   Yes.
3      Q.   It does look like --
4      A.   Looks like more.
5      Q.   Okay.  There's a difference, less or more.
6      A.   It looks like more than 12 inches.
7      Q.   Exactly.
8           (Defendant's Exhibit Number 6 marked for
9           identification purposes and made part of
10          the record.)
11     Q.   (By Mr. Smith) I'm going to hand you what's
12 been marked as Defendant's Exhibit Number 6, which
13 purports to be a police report of the interview that
14 you gave.  And I guess you haven't seen that document
15 either, have you?
16     A.   Oh well.
17          (A brief pause.)
18          Yes, he didn't ask me all these questions.
19 Some of them was right, some of it's wrong.
20     Q.   Okay.  I have given you an opportunity to
21 read the statement, correct, or the report.  Correct?
22     A.   Yes.
23     Q.   Now, you started laughing when you were
24 reading something on Page 1.  What was that that you
25 were laughing about?

Jean Griffin

Page 82

1            You're arguing with the witness and, you
2    know, we'll go to the judge with this.
3            You need to calm down and just answer the
4    question too.
5       Q.   (By Mr. Smith) So now we've established that
6    by the time you were put in the house the first
7    ambulance had been, quote unquote, waved on.  Right?
8       A.   Yes.
9       Q.   Okay.  And you think that was wrong?
10      A.   I think it was wrong.
11      Q.   Different than what you told the detective
12   that night.  Correct?
13      A.   What did I tell the detective that night?
14   I don't understand what I told the detective that
15   night.  I was truly upset and I --
16      Q.   Okay.
17      A.   I was upset and I'm still upset about it.
18      Q.   The fourth paragraph down, first page, last
19   line, I didn't see anything they done wrong.
20           You said it.  Right?
21      A.   Yeah, they were trying to help him.
22      Q.   They were what?
23      A.   You didn't finish reading the sentence.
24      Q.   They were --
25      A.   They were trying to help him.