# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

VELENCIA MAIDEN, as Personal )
Representative of the Estate of )
CLIFTON DARNELL ARMSTRONG, )
deceased, )
                 )
         Plaintiff, )
                 )
v. )
                 )      CASE NO. CIV-14-413-F
THE CITY OF OKLAHOMA CITY, )
OKLAHOMA; JEFFERY[*sic*] DUTTON, )
individually; GREGORY FRANKLIN, )
individually; MOHAMMED TABAIA [*sic*], )
individually; DANIEL HOLTZCLAW, )
individually, )
         Defendants. )

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS DUTTON, FRANKLIN, TABIAI AND HOLTZCLAW AND BRIEF IN SUPPORT

Susan Ann Knight, OBA #14594
Stacey Haws Felkner, OBA #14737
Manchester & Knight, PLLC
One Leadership Square, Suite 800 N
211 North Robinson
Oklahoma City, Oklahoma, 73102
Telephone: (405)235-4671
Facsimile:  (405)235-5247
Attorneys for Defendants, Oklahoma City
Police Officers Jeffrey Dutton, Gregory
Franklin, Mohammed Tabiai, and Daniel
Holtzclaw

Dated: June 1, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS
DUTTON, FRANKLIN, TABIAI AND HOLTZCLAW
AND BRIEF IN SUPPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BRIEF IN SUPPORT OF THE MOTION FOR
SUMMARY JUDGMENT OF DEFENDANTS
DUTTON, FRANKLIN, TABIAI AND HOLTZCLAW . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT AND AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          PROPOSITION I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                    DEFENDANTS DUTTON, TABIAI, HOLTZCLAW AND
                    FRANKLINARE ENTITLED TO SUMMARY JUDGMENT
                    ON PLAINTIFF'S STATE LAW CLAIMS . . . . . . . . . . . . . . . . . . . . . . . 10

          PROPOSITION II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                    DEFENDANTS DUTTON, TABIAI, HOLTZCLAW AND
                    FRANKLIN ARE ENTITLED TO QUALIFIED IMMUNITY ON
                    PLAINTIFF'S FOURTH AND FOURTEENTH AMENDMENT
                    CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## TABLE OF AUTHORITIES

*Aldaba v. Pickens*, 777 F.3d 1148, 1160 (10th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . 16

*Bosh v. Cherokee County Building Authority,* 2013 OK 9,
305 P.3d 994, 997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Breeden v. League Services Corporation*, 1978 OK 27,
575 P. 2d 1374, 1376 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bryson v. Oklahoma County,* 2011 OK CIV APP 98, ¶ 28,
261 P.3d 627, 638 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Christiansen v. City of Tulsa*, 332 F.3d 1270, 1279 (10th Cir. 2003) . . . . . . . . . . . . . . . 20

*Computer Publications, Inc. v. Welton*, 49 P. 2d 732, 735 (Okla. 2002) . . . . . . . . . . . . 13

*Cruz v. City of Laramie*, 293 F. 3d 1183 (10th Cir. 2001) . . . . . . . . . . . . . . . . 8, 9, 16, 19

*DeShaney v. Winnebago County Department of Social Services,*
489 U.S. 189, 197, 109 S. Ct. 998, 103 L. Ed. 2d 249(1989) . . . . . . . . . . . . . . . . . . . . 20

*Estate of Booker*, 745 F. 3d 405 (10th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

*Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1029
(10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Gaylord  Entertainment Company v. Thompson,*  1998 OK 30, 958 P. 2d 128, 149 . . . . 13

*Giannetti v. City of Stillwater*, 216 Fed. Appx. 756
(unpublished) (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-19

*Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Graham v. Connor,* 490 U.S. 386, 109 S. Ct. 1865,
104 L.Ed. 2d 443 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Gray v. University of Colorado*, 672 F.3d 909, 921 (10th Cir. 2012) . . . . . . . . . . . . . . . 20

*Johnson v. City of Tulsa*, 2015 U.S. Dist. LEXIS 4883 . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Moore v. Guthrie,* 438 F.3d 1036, 1042 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 20

*Nail v. City of Henryetta,* 1996 OK 12, ¶ 10, 911 P.2d 914, 918 . . . . . . . . . . . . . . . . . 12

*Perry v. City of Norman,* 2014 OK 119, 341 P.3d 689 . . . . . . . . . . . . . . . . . . . . . . . 10-12

*Pino v. Higgs,* 75 F.3d 1461, 1467 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Quinn v. Young,* 780 F.3d 998 (10th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ruiz v. City of Bethany,* CIV-14-156-M, 2015
U.S. Dist. LEXIS 30836 (March 13, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Tuffy's Inc. v. City of Oklahoma City,* 2009 OK ¶7,
212 P.3d 1158, 1166 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Gilmore,* 776 F. 3d 765, 769 (10th Cir. 2015) . . . . . . . . . . . . . . . . . . 15

*West v. Keef,* 479 F.3d 757, 759 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wiegel v. Broad,* 544 F. 3d 1143 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . 16, 17, 19

*Wright v. Stanley,* CIV-11-1235-C, 2015 U.S. Dist.
LEXIS 23076 (February 26, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS DUTTON, FRANKLIN, TABIAI AND HOLTZCLAW AND BRIEF IN SUPPORT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Officers Jeffrey Dutton, Gregory Franklin, Mohammed Tabiai and Daniel Holtzclaw request the court grant summary judgment in their favor. There are no material questions of fact regarding the claims against these Defendants, and they are entitled to judgment as a matter of law. A brief in support of this motion is attached.

## BRIEF IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS DUTTON, FRANKLIN, TABIAI AND HOLTZCLAW

Plaintiff Velencia Maiden is the mother of decedent Clifton Armstrong.  On the evening of May 1, 2103, decedent Armstrong called 911 from Maiden's residence and told the dispatcher he had been using drugs, he was seeing dragons, he was being followed by dead people, and that he wanted to kill himself. When Maiden got home, Armstrong met her in the driveway and told her "It's happening again," stating the police were trying to kill him. Maiden then called her mother, Jean Griffin, to come over and help her take Armstrong to the hospital.

Defendants Dutton and Tabiai were the first officers to arrive at the scene in response to the 911 call.  They spoke to both Maiden and Armstrong in the house, as well as Griffin when she arrived.  Armstrong initially agreed to go to the hospital, but when the group went outside, Armstrong refused to get in Griffin's car.   Instead, he stripped off all his clothing and was jumping up and down and screaming.  At this point, it became clear that the officers

would have to take Armstrong into protective custody to keep him from injuring himself or someone else.  The officers attempted to handcuff Armstrong, but according to Griffin, "he was just flipping them [the officers] around like little babies."  Maiden and Griffin assisted Officers Dutton and Tabiai in restraining Armstrong until Officers Holtzclaw and Franklin arrived and were able to complete the handcuffing process and restrain Armstrong by putting a hobble strap on his legs.  Armstrong continued to fight and yell even after he was placed in the hobble restraint system.

Once Armstrong was restrained, Officer Tabiai contacted a field supervisor and then retrieved third party emergency detention statements from his car for Maiden and Griffin.  Both Maiden and Griffin filled out and signed third party affidavits stating they believed Armstrong needed immediate emergency action because of mental illness and listing the circumstances supporting this belief.  While Officer Tabiai was explaining the purpose of the third party affidavits to Maiden and Griffin, other officers noticed Armstrong had quit yelling and was not responsive.  They called EMSA, removed the leg restraints, sat Armstrong up, and performed a sternum rub.  Neither EMSA nor hospital personnel were able to revive Armstrong.  The Medical Examiner determined the cause of death was excited delirium due to acute methamphetamine toxicity.

Later that night, Maiden and Griffin both told the investigating homicide detectives that they did not see the officers do anything wrong.  No officer hit, punched or kicked Armstrong or struck him with a baton; no officer used OC pepper spray or a taser.  Maiden's

2

basis for filing the lawsuit is essentially that "something went wrong." She believes that because Armstrong died, the officers must have used excessive force. This belief is not a basis for liability, however.  Unfortunately, individuals do sometimes die in police custody, especially individuals who have ingested significant amounts of methamphetamine or other toxic substances.  Such deaths are always a tragedy, but not a constitutional violation.

In the instant case, based on the 911 call decedent Armstrong made, and the behavior the defendant officers observed at the scene, they had both the right and the obligation to take Armstrong into protective custody.   As is discussed in Proposition I, Plaintiff cannot state a cause of action against the defendant officers under Oklahoma law. As is discussed in Proposition II, the defendant officers did not violate decedent Armstrong's Fourth Amendment or Fourteenth Amendment rights by attempting to restrain him in order to transport him to the hospital.

## STATEMENT OF MATERIAL FACTS

1.    On May 1, 2013, decedent Clifton Armstrong called 911 and told the dispatcher he thought he had lost his mind, he [had] seen dragons, dead people are following him and trying to kill him, he was on drugs, and that he wanted to kill himself.  Transcript of 911 Call attached as Exhibit 1; Audio attached as 1A.  Armstrong called from 1421 N.W. 99th Street, which is the home of his mother, Plaintiff Velencia Maiden. Incident Detail Report, attached as Exhibit 2; Deposition of Velencia Maiden, pp. 9-10, relevant pages attached as Exhibit 3.

3

2.      Defendant Officer Jeffrey Dutton was assigned to respond to the call, with Defendant Officer Mohammed Tabiai as backup.  Incident Detail, Exhibit 2, p. 1. The information available to the defendant officers before they arrived at the scene included the statements made by Armstrong to 911.  Incident Detail, Exhibit 2, p. 2.

3. Plaintiff Maiden was not home when Armstrong called 911, but she arrived home a few minutes before Officers Dutton and Tabiai arrived.  Maiden Deposition, Exhibit 3, pp. 45-47. Because she was concerned by the statement Armstrong made that police were trying to kill him, Maiden immediately called her mother, Jean Griffin, and asked her to come over and take Armstrong to the hospital.  Maiden Deposition, Exhibit 3, pp. 48-49; Deposition of Jean Griffin, pp. 18-19, relevant pages attached as Exhibit 4.

4.      Officers Dutton and Tabiai were already at the house when Griffin arrived. Griffin Deposition, Exhibit 4, pp. 23-24. The officers, Maiden, Griffin, and Armstrong were inside the house discussing whether Armstrong would go to the hospital. Maiden Deposition, Exhibit 3, pp. 52-53; Griffin Deposition, Exhibit 4, pp. 25-26.  At some point in this conversation, Maiden told the officers that Armstrong was having some problems with schizophrenia and needed to go to the hospital to be evaluated.  May 2, 2013 Homicide Interview of Velencia Maiden, attached as Exhibit 5 and 5A.[1]

---

[1]Exhibit 5 is a summary of the interview, rather than a verbatim transcript and is attached for the convenience of the court; Exhibit 5A is the complete video of the interview.

5.      Armstrong initially agreed to go to the hospital with his grandmother, Griffin, but then refused to get in her car. Maiden Deposition, Exhibit 3, p. 56;  Griffin Deposition, Exhibit 4, pp. 25-26.  Griffin wanted Armstrong to ride in her car because it was a two-door, and, once he was in the backseat,  he would not be able to change his mind and get out on the way to the hospital.  Griffin Deposition, Exhibit 4, p. 26.

6.      Armstrong sat down between Maiden's car and Griffin's car, then jumped up, threw his water bottle, and stripped off all his clothes. Maiden Deposition, Exhibit 3, p. 57; Griffin Deposition, Exhibit 4, p. 28.  As Griffin described it, "That's when everything went crazy."  May 2, 2013 Homicide Interview of Jean Griffin, attached as Exhibit 6 and 6A.[2]

7.      The officers continued to try to talk Armstrong into going to the hospital for a few minutes.  Maiden Deposition, Exhibit 3, pp. 57-58.   Griffin heard the officers tell Armstrong they only wanted to take him to the hospital.  Griffin Interview, Exhibit 6, p.2. However, when Armstrong tried to run back into the house, Officers Dutton and Tabiai determined they had an obligation to take Armstrong into protective custody before Armstrong hurt himself or someone  else.  May 6, 2013 Homicide Interview of Jeffrey Dutton, p. 4, attached as Exhibit 7 and 7A; May 6, 2013 Homicide Interview of Mohammed Tabiai, p. 4, attached as Exhibit 8 and 8A.[3]  Under 43A O.S. 5-207(B), any peace officer who

---

[2]Exhibit 6 is a summary of the interview, rather than a verbatim transcript and is attached for the convenience of the court; Exhibit 6A is the complete video of the interview.

[3]Exhibits 7 and 8 are summaries of the interviews, rather than verbatim transcripts, and are attached for the convenience of the court; Exhibits 7A and 8A are  the complete

reasonably believes that a person is a person requiring treatment[4] shall take the person into protective custody.

8.    Maiden and Griffin agreed Armstrong needed to be taken into protective custody.  They both prepared and signed third party affidavits stating they believed Armstrong had a mental illness or was drug dependent to a degree that immediate emergency action was necessary.  Third Party Affidavit of Maiden, attached as Exhibit 9; Third Party Affidavit of Griffin, attached as Exhibit 10.  Maiden stated in her affidavit that "My son is in  a very paranoid hallucinated state of mind" and that he believed both a gang and the police were trying to kill him.  Maiden Affidavit, Exhibit 9.  Griffin stated "He was thinking someone was going [to] kill him or someone was after him.  He was paranoid hallucinate." Griffin Affidavit, Exhibit 10.

9.    The defendant officers had a very difficult time trying to take Armstrong into protective custody.  Maiden Deposition, Exhibit 3, pp. 60-62.  Griffin estimated the struggle lasted ten minutes.  Griffin Deposition, Exhibit 4, p. 40. Defendant Officers Dutton and Tabiai were not able to control or handcuff him.  In fact, Griffin said the officers "had their hands full" and that Armstrong "was just flipping them around like little babies."  Griffin Interview, Exhibit 6, pp. 1-2.  Maiden and Griffin tried to help restrain Armstrong's legs. Maiden Deposition, Exhibit 3, p. 62; Griffin Deposition, Exhibit 4, pp. 29-31.

_____

videos of the interviews.

[4]A person requiring treatment is defined in 43A O.S. §1-103(13), and includes an individual who is threatening to commit suicide.

10.     Another witness at the scene, Maiden's roommate Carlton Donnelly, also stated Armstrong had tremendous strength and "flipped" the officers when they tried to handcuff Armstrong.  Once a third officer arrived at the scene, the officers began to gain control. May 2, 2013 Homicide Interview of Carlton Donnelly, p. 3, attached as Exhibit 11 and 11A.[5] Donnelly also heard the officers tell Armstrong to stop resisting, and that  they were just trying to help him.  Donnelly Interview, Exhibit 11, p. 3.

11.     It took the officers some time to put Armstrong in the hobble restraint because he was struggling.  Griffin Interview, Exhibit 6, p. 1 Griffin testified that Armstrong was on his back at some points during the struggle and face down at others, but that she did not see what position he was in after he was completely restrained.  Griffin Deposition, Exhibit 4, pp. 33-36, 43.   Griffin stated she did not see the officers do anything wrong, and that they were just trying to help Armstrong.   Griffin Deposition, Exhibit 4, pp. 69-70; Griffin Interview, Exhibit 6, p. 1.

12.     No witness saw any officer hit, kick or punch Armstrong.  No witness saw any officer use OC pepper spray or a taser, or strike Armstrong with a flashlight or baton. Maiden Deposition, Exhibit 3, p. 73; Maiden Interview, Exhibit 5, p. 4; Griffin Interview, Exhibit 6, p. 2; Donnelly Interview, Exhibit 11  p. 3.

---

[5]Exhibit 11 is a summary of the interview, rather than a verbatim transcript and is attached for the convenience of the court; Exhibit 11A is the complete video of the interview.

13.     Maiden did not see any specific force used beyond the struggle, and could not identify any force used by the officers as excessive. Maiden Deposition, Exhibit 3, pp. 83, 102-103. The basis for her lawsuit is that because her son died, that proves the officers must have used excessive force. Maiden Deposition, Exhibit 3, pp. 83, 102.

14.     The Medical Examiner determined the manner of death was accidental, and the cause of death was acute methamphetamine toxicity.  Report of Investigation by Medical Examiner, p. 1, attached as Exhibit 12.  In the narrative summary of the findings, the cause of death is described as excited delirium due to acute methamphetamine toxicity. Armstrong's struggle with police could have been an anticipating or aggravating factor, but was not the cause of death.  ME Report, Exhibit 12, p. 2.

15.     Plaintiff's Expert Witness, D.P. Van Blaricom, offers the opinion that police officers should "attempt to control the person's legs without resorting to hogtying," but that the defendant officers in this case bent Armstrong's legs "back toward his buttocks in a hog-tie manner of maximal restraint."  October 28, 2014 Report of D.P. Van Blaricom, p. 5, §9(s)(6); p. 9, §14(h), attached as Exhibit 13. This is not an accurate characterization of the evidence.  In *Cruz v. City of Laramie*, 293 F. 3d 1183 (10th Cir. 2001), in which Van Blaricom testified as an expert witness on the dangers of restraint asphyxia,[6] the Tenth Circuit held officers may not apply a hog-tie restraint to an individual whose diminished

---

[6]*Cruz* does not give the names of the experts who testified, but Van Blaricom states in his expert report that he testified in the *Cruz* case. Van Blaricom Report, Exhibit 11, p. 8, §12(a).

capacity is apparent. *Cruz* at 1188.  The court specifically defined a hog-tie restraint as "the

binding of the ankles to the wrists, behind the back, with 12 inches or less of separation." *Id.*

16.     Griffin testified that she never saw Armstrong restrained with his hands and

feet less than twelve inches apart.  Griffin Deposition, Exhibit 4, pp. 63-64.  Additionally,

during discovery,  Plaintiff Maiden submitted a picture of herself demonstrating the position

in which Armstrong was restrained.  Photograph, attached as Exhibit 12; Maiden Deposition,

Exhibit 3, pp. 108-109; Griffin Deposition, Exhibit 4, p. 64. The distance between her wrists

and ankles appears to be more than twelve inches. Griffin Deposition, Exhibit 4, pp. 64-65.

17.     Van Blaricom's Expert Report also inaccurately characterizes the testimony

of Officer Dutton and Frankin.  While Armstrong did say "get off me," it was not in the

implied context of "because I can't breathe" that Van Blaricom asks the court to infer.

Armstrong actually said "Get off me, get off me, I'm not going."  Dutton Interview, Exhibit

7, p. 6.  Similarly, Officer Franklin's testimony that he was sitting on the outside of

Armstrong's left arm, but got up when Armstrong said he was done fighting, does not

support the intended inference that Armstrong was subjected to "smothering force."

Compare, Van Blaricom Report, Exhibit 13, p. 7, §10(S)(7) and p. 9, §11(j) with May 6,

2013 Homicide Interview of Gregory Franklin, pp 2-3, attached as Exhibit 15 and 15A.

## ARGUMENT AND AUTHORITY

## PROPOSITION I

## DEFENDANTS DUTTON, TABIAI, HOLTZCLAW AND FRANKLINARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS

The first four causes of action in Plaintiff's Amended Petition (Doc. No. 1-1) assert state law claims for violation of Article 2, §30 of the Oklahoma Constitution, assault and battery, wanton and reckless conduct, and intentional infliction of emotional distress. None of these claims provide a basis for recovery.

In *Bosh v. Cherokee County Building Authority,* 2013 OK 9, 305 P.3d 994, 997 the Oklahoma Supreme Court recognized a detainee who had been beaten by jailers had a cause of action for excessive force under Article 2, §30 of the Oklahoma Constitution, even though the Oklahoma Governmental Tort Claims Act expressly immunizes the state and political subdivisions  from liability arising out of the operation of prison facilities. The court reasoned that the immunity provisions of the OGTCA do not mean injured detainees are "at the mercy of their captors to be beaten, assaulted, and left without medical attention without any remedy to deter such conduct." *Id.* at 1000.

However, in *Perry v. City of Norman,* 2014 OK 119, 341 P.3d 689, the Supreme Court held this rationale did not extend to suits alleging excessive force by police officers, because employer liability for a police officer's alleged excessive force conduct under the OGTCA is well settled. *Perry* at 693. Because the plaintiff could have brought a claim for excessive

force against the City under the OGTCA and potentially recovered for that claim, he was not left without a remedy. *Id.* Therefore, the the plaintiff's remedy belongs exclusively within the confines of the OGTCA and a jury's determination concerning whether the police officers were acting within the scope of their employment under the OGTCA, *Perry* at 693, citing 51 O.S. §§151 et. seq. This court recently applied the analysis of *Perry* to dismiss a claim for false arrest and malicious prosecution brought under Article 2, §30 of the Oklahoma Constitution. *Ruiz v. City of Bethany*, CIV-14-156-M, 2015 U.S. Dist. LEXIS 30836 (March 13, 2015). See also, *Johnson v. City of Tulsa*, 2015 U.S. Dist. LEXIS 4883 (no *Bosh* claim may be brought when a cause of action is available under the OGTCA).

Even if the court were willing to entertain a claim based on Article 2, §30, summary judgment would be appropriate based on the Fourth Amendment analysis presented in Proposition II of this brief. As this court recognized in *Wright v. Stanley*, CIV-11-1235-C, 2015 U.S. Dist. LEXIS 23076 (February 26, 2015), the Fourth Amendment of the United States Constitution and Article 2, §30 of the Oklahoma Constitution are identical in substance. Oklahoma state courts have adopted the objective reasonableness test of *Graham v. Connor,* 490 U.S. 386, 109 S. Ct. 1865, 104 L.Ed. 2d 443 (1989). *Wright* at *8, citing *Bryson v. Oklahoma County*, 2011 OK CIV APP 98, ¶ 28, 261 P.3d 627, 638.

11

The defendant officers are also entitled to summary judgment on Plaintiff Maiden's causes of action for assault and battery, wanton and reckless conduct,[7] and intentional infliction of emotional distress.  While assault and battery would not normally be considered to be within the scope of employment, there are certain occupations in which it can be. These include police officers, caregivers, repossessors, and jailers.  *Perry* at 691-692. An assault and battery committed by a police officer is outside the scope of employment only if the officer acts maliciously or in a wilful and wanton manner. *Nail v. City of Henryetta,* 1996 OK 12, ¶ 10, 911 P.2d 914, 918.   Similarly, an employee's act is within the scope of employment if it is done, however ill-advisedly, with a view to further the employer's interest. *Tuffy's Inc. v. City of Oklahoma City,* 2009 OK ¶7, 212 P.3d 1158, 1166.

The rationale behind the tort of intentional infliction of emotional distress is that some behavior is so far outside the bounds of what will be tolerated in a civilized society that it should be actionable even if it does not fit within the scope of traditional tort categories such as assault, false imprisonment, or trespass.  *Breeden v. League Services Corporation*, 1978 OK 27, 575 P. 2d 1374, 1376.  In order to prove intentional infliction of emotional distress, the Plaintiff must establish (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's conduct caused the

---

[7]This argument is not intended to imply "wanton and reckless conduct" should ever be recognized as a stand alone tort.  Instead, it is one of the elements a plaintiff must prove to demonstrate a governmental employee was acting outside the scope of employment when he committed a substantive tort such as assault and battery.

plaintiff emotional distress, and (4) the resulting emotional distress was severe. *Computer Publications, Inc. v. Welton*, 49 P. 2d 732, 735 (Okla. 2002). The trial court acts as a gatekeeper regarding the outrageousness of the defendant's conduct and the severity of the plaintiff's distress. *Computer Publications* at 735; *Gaylord Entertainment Company v. Thompson*, 1998 OK 30, 958 P. 2d 128, 149.

There is simply no way Plaintiff Maiden can establish the required degree of wilful or malicious behavior to prevail on the assault and battery or intentional infliction of emotional distress claims against the defendant officers. Maiden and Griffin both agreed Armstrong needed to be taken into protective custody, and both initially helped to restrain him. Maiden Affidavit, Exhibit 9; Griffin Affidavit, Exhibit 10; Maiden Deposition, Exhibit 3, p. 62; Griffin Deposition, Exhibit 4, pp. 29-31. Griffin stated she did not see the officers do anything wrong, and that they were just trying to help Armstrong. Griffin Deposition, Exhibit 4, pp. 69-70; Griffin Interview, Exhibit 6, p. 1. Maiden also stated she did not see the officers do anything wrong, and that she heard them tell Armstrong they were not there to hurt him or take him to jail. Maiden Interview, Exhibit 5, p. 4. Maiden and Griffin both testified they saw the officers attempt CPR. Maiden Deposition, Exhibit 3, p. 73; Griffin Deposition, Exhibit 4, p. 36.

The defendant officers had a legal obligation under 43A O.S. 5-207(B) to take Armstrong into protective custody, and they were trying to fulfill this obligation when they tried to restrain Armstrong  Clearly the attempt to get Armstrong under control so he could

13

be transported to the hospital did not end as any of the parties hoped it would, but there is simply no evidence the defendant officers intentionally, wilfully, or maliciously tried to harm Armstrong. In the absence of any such evidence, the defendant officers are entitled to summary judgment on the state law claims.

## PROPOSITION II

### DEFENDANTS DUTTON, TABIAI, HOLTZCLAW AND FRANKLIN ARE ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S FOURTH AND FOURTEENTH AMENDMENT CLAIMS

Police officers are often expected to exercise community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute. *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1029 (10th Cir. 1997). In the course of exercising this noninvestigatory function, a police officer may have occasion to seize a person, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity. *Id.* This type seizure is governed by Fourth Amendment standards. *West v. Keef,* 479 F.3d 757, 759 (10th Cir. 2007), citing *Pino v. Higgs,* 75 F.3d 1461, 1467 (10th Cir. 1996). As *Pino* recognizes, the state has a legitimate interest in protecting the community from the mentally ill and in protecting a mentally ill person from self-harm. *Id.* at 1468.

The state's "legitimate interest" in protecting a mentally ill person imposes a duty on individual police officers. Under 43A O.S. 5-207(B), any peace officer who reasonably

believes that a person is a person requiring treatment[8] shall take the person into protective custody.  In *Gallegos*, in which the defendant officers encountered an individual who was drunk, distraught, crying and talking loudly to himself, the court held "We believe the officers would have been derelict in their duties if they had simply ignored Mr. Gallegos and allowed him to proceed." *Gallegos* at 1029.

To take an individual into protective custody, an officer must have probable cause to believe an individual is a danger to himself or others. *United States v. Gilmore*, 776 F. 3d 765, 769 (10th Cir. 2015).  The probable cause standard is appropriate, as *Pino* explained, because a seizure of a person for an emergency mental health evaluation raises concerns that are analogous to those implicated by a criminal arrest, and equally intrusive. *Pino* at 1468.

In the instant case, there is no question the defendant officers had probable cause to take Armstrong into custody.  He told 911 he was seeing dragons and wanted to kill himself; he stripped off all his clothing in the front yard, and both his mother and grandmother signed third party affidavits stating they believed Armstrong had a mental illness or was drug dependent to a degree that immediate emergency action was required.  The only question presented in this case is whether the defendant officers are entitled to qualified immunity for the manner in which they attempted to take Armstrong into protective custody.

_____

[8]A person requiring treatment is defined in 43A O.S. §1-103(13), and includes an individual who is threatening to commit suicide.

Two of the primary cases governing this issue are, ironically, cases in which Plaintiff's expert witness D.P. Van Blaricom has testified, *Cruz v. City of Laramie*, 293 F. 3d 1183 (10th Cir. 2001) and *Wiegel v. Broad*, 544 F. 3d 1143 (10th Cir. 2008).   The defendant officers do not dispute that Van Blaricom is qualified, in the abstract, to testify regarding appropriate restraint techniques.[9]   However, the opinions he offers in the instant case, and the factual evidence upon which these opinions are predicated, do not support liability for the defendant officers under the standards established by *Cruz* or *Wiegel*.

In *Cruz*, the Tenth Circuit held officers may not apply a hog-tie technique when an individual's diminished capacity is apparent.  *Cruz* at 1188.  This diminished capacity might result from severe intoxication, the influence of controlled substances, a discernible mental condition, or any other condition  apparent to the officers at the time, which would make the application of a hog-tie restraint likely to result in any significant risk to the individual's health or well-being. In such situations, an individual's condition mandates the use of less restrictive means for physical restraint. *Id.*   *Cruz* specifically defined a hog-tie restraint as "the binding of the ankles to the wrists, behind the back, with 12 inches or less of separation."  Like any reasonable officer in the Tenth Circuit since *Cruz* was decided, the defendant officers are familiar with this standard.  The uncontroverted evidence in this

---

[9]It should be noted, however, that his opinion a taser should have been used to "gain rapid control" of the situation, see Exhibit 13, p. 6, §9(r)(3)(b) and p. 10, §15(g)(3), is in direct conflict with the recent holding of *Aldaba v. Pickens*, 777 F.3d 1148, 1160 (10th Cir. 2015) (it is not objectively reasonable to employ a taser as the initial use of force against a seriously ill, non-criminal subject).

instant case indicates Armstrong was not hog-tied, because the distance between his hands and feet was greater than 12 inches.

In *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008), the Tenth Circuit held the law was clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated is constitutionally unreasonable due to the risk of positional asphyxiation. However, the evidence in *Weigel* established the decedent was subjected to such pressure for a significant period (the court estimated three minutes) *after it was clear that the pressure was unnecessary to restrain him.* (emphasis added) *Weigel* at 1152. Similarly, in *Estate of Booker*, 745 F. 3d 405 (10th Cir. 2014), the Tenth Circuit found qualified immunity was not appropriate where the defendant officers used various types of force–including a taser, a carotid neckhold, and substantial pressure on the back– against a suspect who was handcuffed and on his stomach. *Id.* at 423.

Unlike *Weigel*, the evidence in this case does not show the defendant officers put pressure directly on Armstrong's back for any longer than was necessary to get him under control. When Officer Franklin stood up to release pressure, which was being applied to the outside of Armstrong's arm rather than directly to his back, Armstrong immediately resumed his attempts to fight with the officers. Franklin Interview, Exhibit 15, pp. 2-3. The facts of the instant case are much closer to the facts of *Giannetti v. City of Stillwater*, 216 Fed. Appx. 756 (unpublished) (10th Cir. 2007).

17

In *Giannetti,* the decedent died after a struggle with several officers in the City of Stillwater municipal jail.The struggle ensued when she violently refused to put on a jail jumpsuit. In *Giannetti*, the decedent was clinically obese, had made non-sensical statements to the officers, told them she took "chill pills," and told them several times during the struggle that she could not breathe. *Id.* at 758, 760. The plaintiff argued the force used was excessive given his wife's mental condition; he also argued that once his wife was handcuffed and placed in a prone position, she posed little immediate threat to the officers and that her physical struggling and kicking of the officers resulted from fear and panic when faced with hampered breathing and possible suffocation. The court recognized that a detainee's mental health must be taken into account when considering the reasonableness of a particular use of force, but concluded the force used was objectively reasonable because the evidence reflects an escalating struggle to which as the officers responded with additional restraint. *Id* at 762. The court stated:

> Despite Ms. Giannetti's evidently irrational behavior and assuming the officers' familiarity with her mental history, we cannot conclude that the officers used excessive force given the "tense, uncertain, and rapidly evolving" situation presented by Ms. Giannetti's behavior.
>
> * * * *
>
> [T]he uncontroverted testimony is that the decedent's actions caused the struggle to escalate. . . .Ms. Giannetti, once prone on the ground, continued to struggle and kick the officers, at one point sending one officer against a locker. We agree that restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest.The medical evidence and witness testimony in this case shows that the officers did not punch, slap, kick or otherwise deliver a blow to Ms. Giannetti. Authorities must be allowed to graduate their response to the demands of any particular situation. (Internal quotes and citations omitted.) *Giannetti* at *764-765.

The defendant officers recognize *Giannetti* is an unpublished case.  However, while it does not qualify as "clearly existing law," it does suggest that *Wiegel* should not be read to suggest restraining impaired individuals in a prone position is always excessive.  A reasonable officer familiar with *Cruz*, *Weigel* and *Booker* would understand he should not hog-tie or use a chokehold on an individual he is taking into protective custody, and should not taser or continue to place substantial pressure on the back of an individual who has already been successfully subdued.  However, no reasonable officer would conclude that the force used in the instant case, in an attempt to get Armstrong under control, violated the Fourth Amendment.

The doctrine of qualified immunity is intended to protect public employees not only from liability, but also from the burdens of litigation.  *Quinn v. Young*, 780 F.3d 998 (10th Cir. 2015). An officer should not be personally liable unless existing precedent has placed the statutory or constitutional question beyond debate.  The actions taken in the instant case by Officers Dutton, Tabiai, Holtzclaw and Franklin were not barred by clearly established law, and they are therefore entitled to qualified immunity on Plaintiff Maiden's Fourth Amendment claim.

Although Plaintiff's sixth cause of action names the individual officers as well as the City of Oklahoma City, it appears to address the standards for municipal liability.  To the extent it states a cause of action against the defendant officers, it simply duplicates the Fourth Amendment claim presented in Plaintiff's fifth cause of action and the defendant officers are

19

entitled to summary judgment for the reasons discussed above.

Finally, in her seventh and eighth causes of action, Plaintiff Maiden asserts the defendant officers are liable under the Fourteenth Amendment because a special relationship existed between the officers and Armstrong and/or because the officers created a danger to Armstrong.   These theories are both exceptions to the general rule that a state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.  *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1279 (10th Cir. 2003), citing *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 197, 109 S. Ct. 998, 103 L. Ed. 2d 249(1989).

Under the special relationship theory, if the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a "special relationship" to protect that individual from violent acts inflicted by others.  *Christiansen* at 1280.  Similarly, the state-created danger theory applies only when a state actor affirmatively acts to create, or increase a plaintiff's vulnerability to, danger from private violence. *Gray v. University of Colorado*, 672 F.3d 909, 921 (10th Cir. 2012).  It does not apply when the injury occurs due to the action of another state actor.  *Id.,* citing *Moore v. Guthrie,* 438 F.3d 1036, 1042 (10th Cir. 2006).

In the instant case, where Plaintiff alleges Armstrong's death was caused by the actions of the police, neither the special relationship nor the state created danger doctrines apply.  Therefore, the defendant officers are entitled to summary judgment on Plaintiff

Maiden's seventh and eighth causes of action.  In the alternative, if the court is willing to recognize a cause of action under these circumstances, this would be an extension of current Fourteenth Amendment principles. The defendant officers would be entitled to qualified immunity under *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006), in which the Tenth Circuit held officials are not required to anticipate future developments in the law.

## CONCLUSION

As the analysis and authority presented above demonstrates, the actions of Defendants Dutton, Tabiai, Holtzclaw and Franklin did not violate Armstrong's rights under either federal or state law. Therefore, the defendant officers are entitled to summary judgment on the state law claims, and summary judgment on the grounds of qualified immunity on the federal claims.

Respectfully submitted,

/s/ Stacey Haws Felkner
Susan Ann Knight, OBA #14594
Stacey Haws Felkner, OBA #14737
Manchester & Knight, PLLC
One Leadership Square, Suite 800 N
211 North Robinson
Oklahoma City, Oklahoma, 73102
Telephone: (405)235-4671
Facsimile:  (405)235-5247
Attorneys for Defendants, Oklahoma City Police
Officers Jeffrey Dutton, Gregory Franklin,
Mohammed Tabiai, and Daniel Holtzclaw

21

## **CERTIFICATE OF MAILING**

This is to certify that on this 1st day of June, 2015, a true and correct copy of the above and foregoing was served on the following, who are registered participants of the ECF System:

E. Ed Bonzie
8201 S. Walker
Oklahoma City, OK 73139

Richard C. Smith
Jennifer Warren
Municipal Counselor's Office
200 North Walker, Suite 400
Oklahoma City, OK 73102

/s/ Stacey Haws Felkner
Stacey Haws Felkner