## D.P. VAN BLARICOM, Inc.

**MPA, FBI-NA, CHIEF of POLICE (Ret)**
*POLICE PRACTICES EXPERT*
835 – 91ST Lane N.E.
Bellevue, Washington 98004-4811
(425) 453-0082 FAX 453-3263 E-Mail dvbinc@aol.com

### Federal Rule 26 (a) (2) (B)
### <u>PRELIMINARY</u> REPORT OF PLAINTIFFS' POLICE PRACTICES EXPERT
### October 28, 2014

1.  My name is D.P. Van Blaricom and I make this report on behalf of plaintiffs in the United States Western District of Oklahoma CIV-2014-413-F filing of *Maiden, et al. v. City of Oklahoma City, et al.* under my file 14-1810.

2.  My law enforcement career has spanned over fifty-seven years of active employment to date:

    a.  Twenty-nine years of continuous police service, during which I was the Chief of Police of Bellevue, Washington for the last eleven of those years;

    b.  Thereafter, I have been engaged as a police practices consultant for an additional twenty-eight years;

    c.  The 9th Circuit's decision in *Glenn v. Washington County, Oregon* (2011) describes me as *"... an expert witness, a former Bellevue, Washington Chief of Police with a law enforcement career spanning over 50 years"*.

3.  A detailed statement of my qualifications, experience, training and a list of all of my publications are attached hereto as Exhibit "A". Both my fee schedule for services and a list of my deposition and trial testimony for the preceding four years are attached hereto as Exhibits "B" and "C" respectively. My areas of expertise in the police arts and sciences include but are not limited to: police administration, policies, practices, procedures and standards of care; police use of force; excited delirium and restraint asphyxia; internal investigation and discipline. As a police practices expert, I have testified in state and federal courts for both plaintiffs and defendants throughout the United States.

4.  Ed Bonzie retained my services on June 13, 2014 to review the facts and circumstances of the death of Clifton Armstrong (decedent), while in the custody of City of Oklahoma Police Department (OPD) officers (defendant officers) on May 1, 2013 (Wednesday) at approximately 2045 hours (8:45 PM). I have discussed the matter with plaintiffs' counsel and this report was prepared in reliance upon the facts and data obtained from my review of the following documents:

    a.  Petition and Amended Petition;

    b.  Answer;

    c.  Defendants' Responses to First Discovery Requests:



DEFENDANT'S
EXHIBIT

13

        1) City,
        2) Officer Jeffrey Dutton,
        3) Officer Gregory Franklin,
        4) Officer Daniel Holtzclaw,
        5) Officer Mohammed Tabiai;

d. Homicide Case Book 13-35649;

e. Chief Medical Examiner's (ME) report 1301895;

f. Photographs;

g. District Attorney's declination;

h. Defendant officers' training records;

i. Recruit Academy curriculums:
        1) Class 128,
        2) Class 129;

j. OPD Operations Manual:
        1) 105.0 – Mission Statement,
        2) 110.0 – Primary Objective,
        3) 115.0 – Police Authority,120.0 – Functional Objectives,
        4) 205.0 – Standard of Conduct,
        5) 215.0 – Conduct Unbecoming a Police Employee,
        6) 220.0 – Respect for Constitutional Rights,
        7) 225.0 – Bias-Based Policing Prohibited,
        8) 233.0 – Confidentiality,
        9) 236.0 – Courtesy,
        10) 250.0 – Attention to Duty,
        11) 285.0 – Allegations of Employee Misconduct,
        12) 290.0 – When to Take Police Action,
        13) 310.0 – General Provisions,
        14) 320.0 – Individual Dignity,
        15) 330.0 – Role of the Individual Officer,
        16) 340.0 – Equality of Enforcement,
        17) 350.0 – Responsiveness to the Community,
        18) 360.0 – Openness of Operation,
        19) 370.0 – Interpersonal Communication,
        20) 505.0 – Nature of the Task,
        21) 510.0 – Police Action Based on Legal Justification,
        22) 520.0 – Preliminary Investigation,
        23) 554.0 – Use of Force – General,
        24) 568.0 – Barricaded Subjects,
        25) 670.0 – Training

k. National Law Enforcement Policy Center:
        1) 001 – Use of Force,
        2) 007 – Investigation of Employee Misconduct,
        3) 070 – Responding to Persons Affected by Mental illness or in crisis,
        4) 076 – Officer-Involved Shootings, In-Custody Deaths and Serious Uses of Force,

5) 126 – Excited Delirium.

5. This report is <u>preliminary</u> because there will be additional documents, which I will need to review.

6. It is my customary practice to evaluate the objective reasonableness of police conduct on a case-by-case basis from the perspective of a former Chief of Police, career law enforcement officer and nationally recognized police practices expert (see Exhibit "A"). In conducting that evaluation I apply:

a. My training and experience as a police officer, who was required to take persons into custody for mental health evaluations in the performance of my law enforcement duties;

b. My training and experience as a police supervisor, who was assigned to conduct internal investigations;

c. My training and experience as a police supervisor and commander, who was assigned to train police officers on police response to the mentally ill and use of force;

d. My training and experience as a police supervisor and commander, who had to evaluate the performance of my subordinate police officers;

e. My training and experience as a chief of police, who had to hire, train, assign, administer and, as may be necessary, discipline and/or terminate police officers;

f. My training and experience as a chief of police, who had to develop and administer policies and procedures for directing police officers under my command;

g. My training and experience as a chief of police, who had to review internal investigations and make the final administrative decision on whether to sustain or not sustain allegations of misconduct;

h. My service as an elected city council member, after my retirement as chief of police;

i. My continuing training, as is supplemented by an ongoing review of professional publications, that addresses contemporary developments in my areas of expertise (see Exhibit "A" Continuing Training);

j. Additionally, I have served as a police practices expert in 1,800+ matters of police-related litigation (see Exhibit "A"), wherein I have testified at deposition or trial in hundreds of cases (see Exhibit "C") on whether or not a particular fact pattern was objectively reasonable under the totality of circumstances.

7. My method of forensic analysis is to compare the specific facts of each case that I review to my training, experience (see Exhibit "A") and recognized professional standards of care:

a. State and federal appellate court decisions such as *Graham v. Connor* and similar citations,

b. National Law Enforcement Policy Center model policies and similar publications.

8. My use of certain terms (i.e. – *"negligent"*, *"reasonable suspicion"*, *"probable cause"*, *"objectively reasonable"*, *"reckless disregard"*, *"deliberately*

*indifferent"*, *"duty"*, *"ratified"*, *"unconstitutional"*, etc.) merely reflects my training and experience, in applying reasonable standards of care to police officers' conduct, and does not presume or imply a statement of any legal opinion.

9.  Similarly, my use of certain terms (i.e. – *"cyanosis"*, *"petechiae"*, *"apnic"*, *"excited delirium"*, *"carotid"*, *"hyoid"*, *"asphyxia"*, etc.) merely reflects my training and experience in reviewing triage and/or autopsy reports and does not presume or imply a statement of any medical opinion.

10.  Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that the deadly risks of restraint asphyxia have long been well documented by authoritative law enforcement sources of information.  In reaching that conclusion, I was specifically mindful of the following relevant and generally accepted literature that was or should have been known to American law enforcement administrators and/or trainers:

a.  International Association of Chief of Police (IACP):
  1) Training Key #281 "Transporting Prisoners" (1978),
  2) Training Key #412 " Transportation of Prisoners II" (1992),
  3) Training Key #429  "Custody Death Syndrome" (1993),
  4) Training Key #541 "The Four-Point Restraint" (2003),
  5) Executive Brief "In-Custody Deaths" (March 1994),
  6) Policy Review "The Prone Restraint - Still a Bad Idea" (Spring 1998),
  7) Policy Review "Added Concern about Four-Point Restraints" (Fall 2001),
  8) Policy Review "British Columbia TASER Commission Report" (Winter/Spring 2005);

b.  National Law Enforcement Policy Center:
  1) Model Policy "Transportation of Prisoners" (August 1990),
  2) Model Policy "Transportation of Prisoners" (October 1996),
  3) Model Policy "Arrests" (February 2003),
  4) Model Policy "Transportation of Prisoners" (April 2005),
  5) Model Police "Excited Delirium" (April 2014);

c.  The Police Chief:
  1) "Law Enforcement Custody Deaths" (August 1988),
  2) "Liability Constraints on Human Restraints" (March 1993),
  3) "Handcuffs and Restraints" (January 1996).

d.  San Diego Police Department's "Final Report of the Custody Death Task Force" (June 1992);

e.  The American Journal of Forensic Medicine and Pathology "Restraint Asphyxiation" (1994);

f.  American Society of Law Enforcement Trainers (ASLET):
  1) "Sudden In-Custody Deaths" (November/December 1995),
  2) "Sudden Custody Death Syndrome: An Overview" (January 17, 1996).

g.  FBI Law Enforcement Bulletin:
  1) "Suspect Restraint and Sudden Death" (May 1996),

      2) "Police Use of Nondeadly Force to Arrest" (October 1997),
      3) "Deaths During Police Intervention" (April 2006);

h. Police:
      1) "Gasping for Breath" (July 1996),
      2) "Combative Subjects Require Special Care" (July 1996),
      3) "Leading the Fight Against In-Custody Deaths" (July 1996);

i. The Police Marksman:
      1) "Analysis of In-Custody Deaths and Positional Asphyxiation" (March/April 1996),
      2) "Medical Risk Factors of Sudden In-Custody Deaths" (November/December 1997),
      3) "Sudden Custody Death Syndrome" (November/December 2005);

j. National Institute of Justice:
      1) Police Use of Force, TASERS and Other Less-Lethal Weapons (2011),
      2) Study of Deaths Following Electro Muscular Disruption (2011);

k. National Law Enforcement Technology Center's "Positional Asphyxia - Sudden Death" (June 1995) – attached hereto as Exhibit "D";

l. Protection & Advocacy's "The Lethal Hazard of Prone Restraint: Positional Asphyxiation" (April 2002 – reprinted 2008);

m. International Association of Directors of Law Enforcement Standards and Training (IADLEST) Newsletter, which was republished by Americans for Effective Law Enforcement (AELE) "Police Response to Excited Delirium" (January 2008) – I authored this article, which is attached hereto as Exhibit "E";

n. TASER International Training Bulletin 15.0 (2009):
      1) *"Once officers engage in capture procedures, it is important to minimize the duration of the physical struggle"* and *"new research shows that physical struggle ….. can cause acidosis that can reach dangerous levels in **ONLY 45 SECONDS** (emphasis supplied) of intense exertion, starting from a resting state"*;
      2) *"Subjects exhibiting symptoms of exhaustion, distress or agitated/excited delirium ….. are at a **SIGNIFICANT RISK** (emphasis supplied) of arrest-related death"* and *"immediate medical attention may reduce the risk"*;

o. American College of Emergency Physicians "Excited Delirium Task Force Report" (2009);

p. Office of Community Oriented Policing Services (COPS) and Police Executive Research Forum (PERF) "Electronic Control Weapon Guidelines" (2011);

q. Investigation and Prevention of Officer-Involved Deaths © 2011 CRC Press – I co-authored that text, which includes:
      1) Chapter 5 – "Excited Delirium",
      2) Chapter 7 – "Positional Asphyxiation";

r. Weapons & Protective Systems Technologies Center (WPSTC) "Special Panel Review of Excited Delirium" (2011):

1) *"First and foremost, these situations are treated as a medical crisis, not criminal"*,

2) *"Signs/symptoms"* of excited delirium syndrome (ExDS) are:

    a) *"Extremely aggressive or violent behavior"*,

    b) *"Constant or near constant physical activity"*,

    c) *"Does not respond to police presence"*,

    d) *"Attracted to/destructive of glass"*,

    e) *"Attracted to bright lights/loud sounds"*,

    f) *"Naked/inadequately clothed"*,

    g) *"Attempted 'self-cooling' or hot to touch"*,

    h) *"Rapid breathing"*,

    i) *"Profuse sweating"*,

    j) *"Keening (unintelligible animal-like noises)"*,

    k) *"Insensitive to/extremely tolerant of pain"*,

    l) *"Excessive strength (out of proportion)"*,

    m) *"Does not tire despite heavy exertion"*,

3) Response strategy:

    a) *"Ensure adequate backup (police presence) to handle the incident"*,

    b) *"Gain rapid control"* to end struggle as quickly as possible and TASER is *"a fast way to restrain" with minimum struggle*,

    c) *"Ensure breathing"* and **NOT** (emphasis supplied) *"pinned to the ground"* or do *"anything that might restrict"* ability *"to breathe at a faster rate and deeper volume than usual"*;

s. Americans for Effective Law Enforcement (AELE), as endorsed by the Institute for the Prevention of In-Custody Deaths (IPICD), has published recommendations for *"dealing with a person undergoing an acute psychotic episode and/or (excited) delirium, wherein officers should"* (2013):

1) *"Regard what is occurring as a* **MEDICAL EMERGENCY** (emphasis supplied)*, with an important goal being, transporting the person to a medical facility and/or attempting to get EMS to the location quickly"*;

2) *"Call for backup – It will become vital to try to control the person, so they don't harm themselves or others, so they can be transported"* and *"a degree of force will almost certainly be needed"*;

3) *"If possible, turn off sirens, flashing lights, and headlights at the scene; such things will only increase the person's hyper state and make them more agitated"*;

4) *"Recognize that the person may be experiencing bizarre hallucinations that seem real to them"* and *"anticipate that they*

may act suddenly, seemingly irrationally, and that reasoning with them will not ordinarily work";

5) "It is best, if possible, to take the person to the ground and restrain them in handcuffs – **ROLL THEM ON THEIR SIDE** (emphasis supplied) after this is done to promote them breathing adequately";

6) "Attempt to control the person's legs **WITHOUT RESORTING TO HOGTYING** – a hobble restraint strap on the ankles can be helpful, and after it is fastened, an officer can step on it, effectively helping to keep the person down without putting **SMOTHERING FORCE DIRECTLY ON THEM**" (emphases supplied);

7) "**USE OF A TASER IN THE STUN MODE MAY BE UNAVAILING** as, if the person is experiencing delirium, they may be essentially immune to pain" and "if a TASER is used in the dart mode, it is to be used **ONCE** (emphases supplied) to create a period of opportunity to attempt restraint";

8) "Avoid, if at all possible, ANYTHING that interferes with the person FULLY (emphases supplied) breathing".

11.  The National Law Enforcement Policy Center's Model Policy on "Excited Delirium" directs:

a. The need to have "a coordinated approach between emergency operations centers, paramedics, law enforcement officers and emergency room staff is **ESSENTIAL**" (emphasis supplied);

b. The following "events" typically occur:
1) "The individual presents with symptoms of excited delirium", which may include:
   a) "Extreme aggression or violence",
   b) "Constant or near constant physical activity",
   c) "Irresponsiveness to police presence",
   d) "Attraction to bright lights and/or loud sounds",
   e) "Nakedness or inadequate clothing",
   f) "Hyperthermia",
   g) "Rapid breathing",
   h) "Profuse sweating",
   i) "Unintelligible or animal-like noises",
   j) "Insensitivity to or extreme tolerance of pain",
   k) "Excessive, seemingly superhuman strength",
2) "There is a struggle with law enforcement",
3) "Physical, chemical or electronic control weapon force is used",
4) "The individual is restrained by law enforcement",
5) "The individual ceases to struggle and his breathing becomes labored and shallow",
6) "Within minutes, the individual is dead";

c. The excited delirium syndrome "began to surface in the 1980s".

12.  I have served as a police practices expert in 73 restraint asphyxia cases to date and, among those, my clients prevailed in the federal appellate decisions of:

   a.  *Cruz v. City of Laramie* (10th Cir. 2001);
   b.  *Arce v. City of North Las Vegas* (9th Cir. 2008);
   c.  *Weigel v. Broad* (10th Cir. 2008).

13.  Further, the *"excited delirium"* case of *Mann v. TASER, International* (11th Circuit 2009) is instructive:

   a.  The condition of *"excited delirium is a widely accepted entity in forensic pathology"*,
   b.  The "*signs and symptoms typically*" include:
      9)  *"Bizarre or violent behavior"*,
      10) *"Hyperactivity"*,
      11) *"Hyperthermia"*, which has been described by the University of Miami as, *"A harbinger of death in these cases"*,
      12) *"Confusion"*,
      13) *"Great strength"*,
      14) *"Sweating and removal of clothing"*,
      15) *"Imperviousness to pain"*;
   c.  And, *"if a delay in treatment worsens the condition"* there may have been *"deliberate indifference"* to a *"serious medical need"*.

14.  Based upon my knowledge, skill, experience, training or education and a careful consideration of the totality of circumstances in this matter, it is my considered professional opinion that the following facts appear to be supported by the record:

   a.  Decedent's description was:
      1)  African-American male,
      2)  Age 38 years,
      3)  5 feet 8 inches tall,
      4)  Weight of 200 pounds;
   b.  Decedent displayed the characteristic signs of excited delirium:
      1)  *"Hot to the touch"*,
      2)  *"Naked"*,
      3)  *"Abnormally strong and not showing any signs of fatigue"*,
      4)  *"Oblivious to pain"*,
      5)  *"Hallucinating"* – people/police are trying to *"kill me"* ,
      6)  *"Making incoherent noises"* ,
      7)  *"Mood swings"* from cooperative to uncooperative;
   c.  Additionally:
      1)  He was known to have a history of drug use,
      2)  He had recently ingested methamphetamine;
   d.  Decedent was reportedly *"suicidal"* ;
   e.  Decedent's mother and grandmother were present and wanted police assistance in facilitating an Emergency Order of Detention (EOD) for an involuntary mental health evaluation;

f. After a prolonged attempt to have decedent voluntarily go to a hospital, he refused and removed his clothing;

g. Thereupon, Officers Dutton and Tabiai attempted to physically control decedent but were unable to accomplish that task alone and a prolonged physical struggle ensued;

    1) Officer Holtzclaw arrived to assist by controlling decedent's legs,

    2) Officer Franklin arrived to assist by providing an ankle hobble;

h. The officers were finally able to handcuff decedent behind his back, hobble his ankles and connect them to a belt around his waist, thereby bending his legs back toward his buttocks in a hog-tie manner of *"maximal restraint"*;

i. Plaintiff was held face down and continued to struggle against his restraints, while the officers held him down against the ground, during which time he was heard to say, *"Get off me"*;

j. Decedent tried to *"roll over"* but Officer Franklin *"sat on his left arm"* to prevent him from accomplishing that move;

k. During the struggle, a Fire Department crew, who had been called to the scene, were *"waved off"* by an unidentified police officer, who advised *"they were not needed and the call was a psych patient off his medications"*;

l. Officers noted that decedent had ceased breathing and removed the hobbles but left him handcuffed, in case he was *"faking"* or *"playing possum"* ;

m. After Medics arrived, the handcuffs were finally removed too;

n. Medics efforts to resuscitate decedent were unsuccessful and he was transported to the hospital, where he was pronounced dead;

o. ME conducted an autopsy and ruled the *"Manner of death"* to be an *"accident"*;

p. ME further concluded:

    1) *"It is felt that the cause of death is regarded to be excited delirium"*,

    2) *"Most likely related to methamphetamine toxicity"*,

    3) *"The physical confrontation with the OPD would have been an aggravating factor to his death"*,

15. Based upon my knowledge, skill, experience, training or education and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that defendant officers were inadequately trained and consequently exacerbated decedent's medical emergency. In reaching that conclusion I was especially mindful of the following information from the record:

a. All of the information previously described herein;

b. Excited delirium has been well known the be a life-threatening medical emergency, which law enforcement officers can be expected to encounter, since at least the year 2005 and earlier;

c. Nevertheless, neither OPD Recruit Academy Class 128 or 129 contained any instruction of the subject of excited delirium:

1) Class 128 was 30 weeks in length and contained 2 hours on *"Narcotics and Meth Investigations"* of currently unknown content,

2) Class 129 was shortened to 18 weeks and dropped the *"Narcotics and Meth Investigations"* component;

d. None of defendant officers' in-service training records reflect any excited delirium training whatsoever;

e. Furthermore, only defendant Officer Tabiai has received essential training on use of the TASER to restrain and control an excited delirium subject in the shortest possible time, without the extreme danger of a prolonged physical struggle, and that training was received post incident;

f. Had defendant officers received the requisite training, they more probably than not would have known how to restrain and control decedent with minimum exposure to an excited delirium death;

g. In compliance with such training, defendant officers would have further more probably than not (see Exhibit "E"):

1) Recognized decedent to have been experiencing the medical emergency of excited delirium,

2) Immediately called for Medics to respond to the scene, before proceeding to restrain or control decedent, and thereby had medical assistance already available,

3) Had sufficient officers (minimum of 4) available to quickly overpower decedent and secure him without a prolonged struggle and/or had a qualified officer available to quickly secure him under power by use of a TASER in the *"probe"* mode,

4) Recognized that bending his legs back toward his buttocks, in a hog-tie manner of *"maximal restraint"*, will likely cause a continuing struggle against the restraints,

5) Recognized that continuing to hold him face down against the ground will likely cause a continuing struggle against the restraints (see the *"vicious cycle"* described in Exhibit "D");

6) Continued to monitor decedent's vital signs, especially his breathing;

7) Removed handcuffs as well as hobbles immediately upon decedent's cessation of breathing;

h. Had defendant officers proceeded in the afore described manner, decedent would have had the best chance of surviving his excited delirium medical emergency;

i. To the contrary and more probably than not due to their inadequate training, defendant officers actually worsened decedent's excited delirium medical emergency and failed to provide an opportunity for survival.

16. I am prepared to testify to these opinions at deposition or trial, if called upon to do so.

17.  If I am provided with further documentation for my review, I may have additional opinions.

/s/ *D.P. VAN BLARICOM*

# EXHIBIT "A"

## D. P. VAN BLARICOM, INC.

**MPA, FBI-NA, CHIEF OF POLICE (RET.)**
*POLICE PRACTICES EXPERT*
835 - 91ST LANE N.E.
BELLEVUE, WASHINGTON 98004-4811
(425) 453-0082  FAX (425) 453-3263  E-Mail dvbinc@aol.com

### SUMMARY of QUALIFICATIONS

A. Retained as a police practices expert by both plaintiffs and defendants in over **1,800** lawsuits alleging police liability throughout the United States: AK, AL, AZ, CA, CO, DC, DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MD, ME, MI, MN, MO, MS, MT, NC, ND, NE, NH, NJ, NM, NV, NY, OH, OK, OR, PA, RI, SC, SD, TX, UT, VA, WA, WI and WY.

B. Testified in several hundred depositions, federal court trials, state court trials and arbitrations.

C. Prevailing parties' police practices expert in appellate decisions from the United States 1st, 6th, 7th, 8th, 9th and 10th Circuits; State Supreme Courts of AK, AZ, CO, ID, MT, MS, OR and WA; Appeals Courts of AZ, CA, CO, FL, GA and WA.

D. Recognized as an expert on the following issues and **all of the cited appellate court decisions were decided in favor of my client**:

1. **POLICE ADMINISTRATION, POLICY, PRACTICES, PROCEDURES and STANDARDS of CARE** (9th Cir. Gulliford v. Pierce County 1998, 6th Cir. Carter v. City of Detroit 2005, 9th Cir. Hall v. Hughes 2007, 7th Cir. Montano v. City of Chicago 2008, 9th Cir. Tensley v. City of Spokane 2008, 9th Cir. Howell v. Yavapai County Attorney 2008, 9th Cir. DeLew v. Adamson 2008, 9th Cir. Tennison v. City & County of San Francisco 2009 and 9th Cir. Rosenbaum v. Washoe County 2011);

2. **POLICE INTERNAL INVESTIGATION and DISCIPLINE;**

3. **POLICE USE of FORCE – Including 350+ Officer-Involved Shootings and 50+ TASER Deployments** (quoted in *Deadly Force: What We Know* 1992, 9th Cir. Davis v. City of Ellensburg 1989, 9th Cir. Reed v. Hoy 1989, 9th Cir. Davis v. Mason County 1991, a consultant to federal prosecution task force in United States v. Koon, et al. 1993, Rodney King v. City of Los Angeles 1994, 1st Cir. Roy v. City of Lewiston 1994, ID S.Ct. Kessler v. Payette County and State of ID 1997, WA App. Lee v. City of Spokane 2000, 9th Cir. & US S.Ct. Haugen v. City of Puyallup 2003/2004, 9th Cir. Wilkins v. City of Oakland 2003, 9th Cir. Marsall v. City of Portland 2004, 8th Cir. Craighead v. City of St. Paul 2005, 9th Cir. Davis v. City of Las Vegas 2007, 9th Cir./US S.Ct./9th Cir. Lehman v. City of Reno 2007/2009, 9th Cir. Kiles v. City of North Las Vegas 2008, 9th Cir. Tubar v. City of Kent 2008, AZ App. Celaya v. City of Phoenix 2008, 10th Cir. Rhoads v. Big Horn County 2009,

Bryan v. City of Las Vegas 2009, 6th Cir. Jefferson v. City of Flint 2010, 6th Cir. Bletz v. Ionia County 2011, AK S.Ct. Russell v. City of Kotzebue 2011, 9th Cir. Glenn v. Washington County 2011, 6th Cir. Haley v. City of Elsmere 2011, 9th Cir. Kita v. City of Seattle 2012, 9th Cir. & US S.Ct. denied cert. Rutherford v. City of Seattle 2013, 6th Cir. Jones v. Sandusky County 2013);

4. **CONTROL of POLICE VEHICULAR PURSUIT and EMERGENCY DRIVING – Including 200+ Accidents** (my policy was recommended by the Public Risk and Insurance Management Association of Washington, D.C. as being among the 4 best in the United States 1984, quoted by 2 CA App. Payne v. City of Perris 1993 and Berman v. City of Daly City 1993, OR S.Ct. Lowrimore v. Marion County 1990, MS S.Ct. Mosby v. Jeffries 1998, CO S.Ct. Tidwell v. City & County of Denver 2003, WA App. Brooks v. City of Washougal 2007, CO App. Meyer v. City of Evans 2008 and GA App. McCobb v. Clayton County 2011);

5. **SPECIAL DUTIES to PROTECT and 911 RESPONSES** (WA S.Ct. Bailey v. Town of Forks 1987, 9th Cir. Wood v. Ostrander 1988, WA S.Ct. Roy v. City of Everett 1992, AZ S.Ct. Hutcherson v. City of Phoenix 1998, MT S.Ct. Nelson v. Driscoll 1999, 9th Cir. Kennedy v. City of Ridgefield 2005 and 9th Cir. Tamas v. WA DSHS 2010)

6. **DOMESTIC VIOLENCE** (quoted by the National Law Enforcement Policy Center in their model policy 1991, 9th Cir. Beier v. City of Lewiston 2004, WA App. Osborne v. Seymour 2011 and WA S.Ct. Washburn v. City of Federal Way 2013);

7. **POLICE RESPONSE to the MENTALLY ILL** (listed in the FBI Academy's Subject Bibliography, 9th Cir. Gibson v. Washoe County 2002, US MD PA Schorr v. Borough of Lemoyne 2003 and 9th Cir. Herrera v. City of Las Vegas 2004);

8. **EXCITED DELIRIUM and RESTRAINT ASPHYXIA – Including 50+ Deaths** (10th Cir. Cruz v. City of Laramie 2001, AZ App. Oscielowski v. City of Benson 2003, 9th Cir. Arce v. City of North Las Vegas 2008 and 10th Cir. Weigle v. State of WY 2008);

9. **AMERICANS with DISABILITIES ACT** (10th Cir. Davoll v. City of Denver 1996, 9th Cir. Cripe v. City of San Jose 2001 and US PA Schorr v. Borough of Lemoyne 2003);

10. **DISCRIMINATORY ENFORCEMENT or EMPLOYMENT PRACTICES** (6th Cir. Muniz-Muniz v. US Border Patrol 2013).

D. Served 29 years in municipal policing with the last 11 as Chief of Police (until retirement and election to the City Council) in Bellevue, Washington - the State's then fourth largest and fastest growing city.

E. Directed development of a progressive police department and created several model programs, including: control of vehicular pursuits, alternatives to deadly force, fully integrated emergency response team operations, domestic violence reduction, affirmative action employment of minorities and women, comprehensive crime prevention, lateral recruitment of experienced officers, police canine operations, multi-city narcotics unit and others. Additionally, co-authored the Washington State Standards on Internal Discipline of Law Enforcement agencies.

F. Served on many professional commissions and committees, including: Washington Criminal Justice Education & Training Center Steering Committee, Bellevue Community College Local Advisory Council and Chairman Law Enforcement Program Advisory Board, Washington Attorney General's Committee on Security and Privacy, consultant to U.S. Department of Justice Community Relations Service, consultant to the National Consultation on Safety and Force, intern

with 94th Congress, Governor's appointee to Community Task Force for Corrections Development, Washington State Council on Crime & Delinquency's Adult Criminal Policy Committee and Ad Hoc Committee on Board of Prison Terms/Paroles, Youth Eastside Services Board of Trustees, Eastside Community Mental Health Center Advisory Board, King County Executive's appointee to E911 Task Force, U.S. Attorney's Law Enforcement Coordinating Committee, Governor's appointee to Select Committee for Police/Fire Pension Review, IACP's Education & Training Committee, IACP's Organized Crime Committee, Assessor Team Leader for 1 of 5 Pilot Projects of the Commission on Accreditation for Law Enforcement Agencies, Governor's appointee to the Emergency Commission on Prison Overcrowding, IACP book reviewer, Suburban Cities Association's Jail Advisory Committee, Governor's Advisory Group on Personal Harassment, Portland, Oregon Chief's Committee on Police Use of Force. Assisted the appointing authorities at various times in selecting Chiefs of Police for Cities of Longview, Everett, Bellingham, Richland, Bremerton, Kirkland, Redmond, Clyde Hill, Kent (1991), Bellevue (1996) a Sheriff of King County and the Security Administrator of Seattle City Light (all in the State of Washington), King County Regional Justice Center Citizens Site Advisory Committee, Solutions To Tragedies of Police Pursuits Advisory Board, Superintendent of Public Instruction's Washington State Safe Schools Advisory Committee, King County Civil Rights Commission, Bellevue College Criminal Justice Program Advisory Board, Voices Insisting on Pursuit Safety.

G. Hold a Secret security clearance from the U. S. Government.

H. Maintain an extensive and current library of standards, policies, procedures, references, and information on other experts, with subscription services to update professional/legal developments in my areas of expertise.

## EDUCATION and CERTIFICATION

University of Washington - Bachelor of Arts degree with magna cum laude honors l973
Seattle University - Master of Public Administration degree 1976
Graduate of the FBI's National Academy and Law Enforcement Executive Development programs
**University of Washington – Certificate in Forensics 2000**
**Americans for Effective Law Enforcement – Certified Police Litigation Specialist 2003/2008/2011**

## CONTINUING TRAINING

Police Civil Liability AELE 1987, Deadly Force and the Police Officer NWU 1987, Police Liability for Policies and Practices AELE 1988, PR-24 Side Handle Baton BPD 1988, Police Civil Liability AELE 1989, Sexual Harassment and the Consequences FS 1989, Wrongful Discharge RIMS 1989, Police Practices and Use of Expert Witnesses AELE 1989, Expert Witnesses, Litigation Consultants and Attorneys NFS 1989, Police Discipline and Labor Problems AELE 1990, Assessment Center Selection Process HRA 1991, Rodney King Incident and Policing SWLEI 1992, Role of Expert Witnesses in the 1990's SEAK 1992, Critical Liability Issues AELE 1992, Pursuit Driving and Managing Use of Force ILM 1992, AFIS Live ID HP 1993, Police/Medical Investigation of Death IACP 1993, Medical Records Review for the Legal Professional PES 1994, Developing Policies, Procedures and Rules NLEPC 1994, Civil Rights Trial Advocacy ATLA 1994, Family Violence and

4

Police Policy SLEI 1995, Investigation of Excessive Force Incidents IACP 1995, Police Civil Liability and Defense of Misconduct Complaints AELE 1996, Use of Force and Pursuit Driving Policies SLEI 1996, Critical Incident Dispatching NWU 1996, Police Officer Survival Tactics NWU 1997, Police Civil Liability AELE 1998, Criminal Justice WSBA 1999, Critical Incident Trauma and Legal Survival CP 1999, Traffic Stops and Racial Profiling PI 2001, Racial Profiling NWU 2001, Police Liability LES 2002, Cap-Stun ZARC 2002, Masters in Trial ABOTA 2002, Discipline and Internal Investigations AELE 2003, Critical Incident Response Management and Liability AELE 2003, Police Civil Liability AELE 2003, Police-Involved Shooting Reconstruction NWU 2004, Police Liability AELE 2005, Shooting Reconstruction AAFS 2005, Police Misconduct Litigation SULS 2005, Use of Force TASER 2006, Lethal and Less-Lethal Force AELE 2006, TASER AAFS 2006, Excited Delirium SPD 2007, Winning Extreme Encounters from Street to Court FSRC 2007, Sudden Death, Excited Delirium & In-Custody Death IPICD 2007, Discipline & Internal Investigation AELE 2008, Police Liability LES 2009, Legal, Psychological and Biomechanical Aspects of Officer-Involved Lethal and Less-Lethal Force AELE 2009, Use of Force / Domestic Violence / Community Policing / Emotional Intelligence IACP-PCN 2009, Gunshot Residue / Gunshot Wounds AAFS 2010, Active Shooter / Bloodborne Pathogens / Applied Ethics / Ethnic and Sexual Harassment IACP-PCN 2010, Arrest-Related Excited Delirium Sudden Death IPICD 2010, Discipline and Internal Investigations AELE 2010, ECD Forensic Analyst IPICD 2010, Police Liability LES 2011, Police Pursuit Policy Instructor IADLEST/ALERT 2011, Police De-Escalation Strategies for Veterans in Crisis FBINA 2012, Federal Training Resources IADLEST 2012, Brady v. Maryland and Giglio v. USA FLETC 2012, Pursuit Policy Course IADLEST/NHTSA 2012, How to be a Good Expert Witness NIJ 2012, Dealing with Persons with Mental Illness NWUCPS 2012, Active Shooter: Issues and Updates NTOA 2013, Management, Oversight and Monitoring of Use of Force (emphasis on TASER) AELE 2013, Less-Lethal: Current Trends and Initiatives NTOA 2013, Negotiations: Understanding the Incident Assessment Process NTOA 2013, Connecting: CIT and SWAT Crisis Negotiation CIT 2013, Searches Incident to Arrest and Cell Phones FLETC 2014, Use of Force (Legal Aspects) FLETC 2014, Developing Legally Defensible Policies for Effective and Constitutional Policing / Use of Force / Internal Affairs and Investigating Misconduct / Force of Weapons – Parts 1 and 2 DLG 2014, Shooting Reconstruction: The 4 Elements of Trajectory RTI 2014, Meaning and History of the U.S. Constitution HC 2014, Lethal and Less-Lethal Force AELE 2014.

### TEACHING and TRAINING EXPERIENCE

Washington State Vocational Education Certificate for teaching Police Supervision, taught law enforcement courses at the Bellevue Police Academy, Washington Criminal Justice Education and Training Center, Bellevue Community College, Seattle University, Northwestern University's Traffic Institute and International City Management Association's Training Institute.  Lectured on police-related issues before the University of Washington School of Law and Graduate School of Public Affairs, Simon Fraser University, American Civil Liberties Union, Washington State Bar, Seattle-King County Bar, Washington State Court Administrators, Washington Association of Legal Secretaries, American G. I. Forum, United States Justice Department Community Relations Service, National Institute of Law Enforcement and Criminal Justice, U. S. Attorney General's Task Force on Family Violence, Montana Department of Social and Rehabilitation Services, Washington Advisory Committee to the U.S. Commission on Civil Rights, American Society of Criminology, debated California Highway Patrol Commissioner on police pursuit before National Association of Police Planners and International Association of Police Planning and Research Officers in 1990, Labor

5

Relations Information System, City of Bellevue's Management Certificate Training Program, lectured for Association of Trial Lawyers of America's Civil Rights Section and the National College of Advocacy on excessive force from the expert's perspective in 1994 and domestic violence litigation liability arising from failure of prevention and response in 1995, lectured on loss prevention civil liability to Nordstrom Washington/Alaska Region in 1997, demonstrated expert witness testimony to the American Board of Trial Advocates in 2002. Additionally, served on the Law Enforcement Education Advisory Committee to the Washington State Board for Community College Education in developing their statewide curriculum, achieved the first college accreditation of a Basic Law Enforcement Academy in the State of Washington, testified before the California State Senate on police vehicular pursuit in 2005, testified before the City of Oakland Citizens' Police Review Board on police vehicular pursuit policy in 2007, lectured at the Henry C. Lee Institute of Forensic Science on Investigation of Officer-Involved Shootings in 2010, lectured at the Crisis Intervention Team International Conference of Prevention of Police-Involved Deaths of the Mentally Ill in 2013.

## PUBLICATIONS

"Recruitment and Retention of Minority Race Persons as Police Officers" in September 1976 issue of The Police Chief magazine, "An Overview of Police Service Today" in the April 18th and May 2nd, 1978 issues of Law Enforcement News, "Kids Meet Cops Through Basketball Trading Card Program" in the July 9th, 1979 issue of Law Enforcement News, "A Police Chief's View of Deadly Force" in the National Institute of Law Enforcement & Criminal Justice January 1979 booklet on Police Use of Deadly Force, "Career Development: The Next Step to Police Professionalism" in the November 1979 issue of The Police Chief magazine, "Crime Prevention Cuts Insurance Cost" in the August 1980 issue of Center City Report, "A Sensible Alternative to Those High-Speed Chases" in the November 25, 1980 issue of The Seattle Times, "Chiefs Should Chase Sane Pursuit Driving Guidelines" in the December 22, 1980 issue of Law Enforcement News, "Commercial Crime Prevention Can Earn Discounts" in the February 1981 issue of the FBI Law Enforcement Bulletin, "Enforcing Malicious Harassment Laws" in the January 1983 edition of Washington Council on Crime and Delinquency News, "Reducing Crime, Traffic Accidents - Bellevue Shows It Can Be Done" in the May 10, 1983 issue of The Seattle Times and the June 27, 1983 issue of Law Enforcement News, "Carrying A Gun - It Depends On You" in the February 3, 1985 issue of the Journal-American, "When To Use Deadly Force" in the Winter 1985 issue of the Washington Law Enforcement Executive Journal, "Domestic Violence - A New Approach to an Old Problem" in the June 1985 issue of The Police Chief magazine, "It's Time for Police To Re-Examine Their Role In Society" in the October 1, 1989 issue of The Seattle Times, "Shaking The Pillars of Police Tradition" in the October 31, 1989 issue of Law Enforcement News, "Training-The First Hundred Years" in Law Enforcement In Washington State: The First Hundred Years 1889-1989, "K-9 Use of Force: A Biting Example of Questionable Policy" in the July/August 1992 issue of Law Enforcement News, "Police Pursuit: Uncontrolled Deadly Force" in the February 28, 1993 issue of Law Enforcement News, Bulletin Alert on a "Hair-raising Comb" in the June 1994 issue of the FBI Law Enforcement Bulletin, "Excessive Force - The Expert's Perspective" in the Association of Trial Lawyers of America July 1994 Annual Convention Reference Materials Volume I, "Domestic Violence Litigation: Liability Arising from Failure of Prevention and Response" in the Association of Trial Lawyers of America July 1995 Annual Convention Reference Materials Volume I, "Shades of Blue: What White Police Officers Can - and Must - Learn from Minority Officers" in the January/February 1996 of the Police Executive Research Forum's Subject to Debate, "Doing Something About Excessive Force" in the January 15, 1998 issue

of <u>Law Enforcement News</u> (republished by San Diego State University 2003), "The Consistent Law Enforcement Expert" in the November/December 1998 issue of <u>The Forensic Examiner</u>, "To Pursue or Not to Pursue: THAT is the Question" in the November 1998 issue of <u>Police</u>, "Handling the Mentally Ill" in the March 2000 issue of <u>Police</u>, "Building a Bridge" in the September 30, 2000 (25th Anniversary) issue of <u>Law Enforcement News</u>, "The Media: Enemies of Allies?" in the April 2001 issue of <u>The Police Chief</u>, "Control of Police Vehicular Pursuit" in the 2004 (1) issue of the <u>Law Enforcement Executive Forum</u>, "Preventing Officer-Involved Deaths of the Mentally Ill" in the Third Quarter 2004 issue of <u>The Law Enforcement Trainer</u>, "Suicide-by-Cop" in the September-October 2006 issue of <u>American Cop</u>, "Police Response to Excited Delirium" in the January 2008 issue of the <u>IADLEST Newsletter</u> (republished by Americans for Effective Law Enforcement 2008), "Policing in the 1950's" in the January-February 2009 issue of <u>National Academy Associate</u>, "Investigation of Officer-Involved Shootings" in the 19th Annual Markle Symposium program guide September 27-28, 2010 program, **Co-Author (with Dr. Cyril Wecht, Dr. Henry Lee and Chief Mel Tucker) of *INVESTIGATION and PREVENTION of OFFICER-INVOLVED DEATHS © 2011 CRC Press**,* "Implementing Change" in the Fall 2012 issue of <u>Seattle University Magazine</u>.

### NATIONAL TELEVISION and RADIO APPEARANCES

~~NBC Nightly News special report on the dangers of police vehicular pursuit.~~
NBC Today Show:
1. Personal protection against criminal attack;
2. Misuse of pepper spray to punish;
3. Police use of force (opposite Rev. Al Sharpton).
NBC *"You Be The Judge"* on the dangers of police vehicular pursuit.
NPR *"Cops and the Mentally Ill"*.
CKNW World Today:
1. TASER;
2. Restraint asphyxia.
KOGO Clear Channel on police vehicular pursuit.
KHOU-TV (CBS) on police vehicular pursuit.

### QUOTED in MAJOR NEWSPAPERS

<u>USA Today</u>, <u>Wall Street Journal</u>, <u>The New York Times</u>, <u>The Baltimore Sun</u>, <u>Los Angeles Times</u>, <u>San Francisco Chronicle</u>, <u>The Seattle Times</u>, <u>The Oregonian</u>, <u>Toronto Sun</u>, <u>The Virgin Island Daily News</u> ("Deadly Force" won ABA's 2004 Silver Gavel Award), <u>The Tennessean</u>, <u>Christian Science Monitor</u>, <u>Milwaukee Journal Sentinel</u>, <u>Vancouver</u> (B.C.) <u>Sun</u>, <u>Ottawa Citizen</u>., <u>Louisville Courier-Journal</u>, <u>Chicago Tribune</u>.

### PROFESSIONAL MEMBERSHIPS

**American Academy of Forensic Sciences (AAFS)**, International Association of Chiefs of Police (IACP) - Life Member, Americans for Effective Law Enforcement (AELE), Association of Certified Litigation Specialists (ACLS), FBI National Academy Associates, Washington Association of Sheriffs & Police Chiefs (WASPC) - Life Member, International Association of Directors of Law Enforcement Standards and Training (IADLEST), National Tactical Officers Association (NTOA), Association of

7

Professional Law Enforcement Emergency Vehicle Response Trainers International (ALERT), CIT (Crisis Intervention Team) International.

## AWARDS

USMC Expert Rifleman, FBI "Possible Club" (of the 19,130 police officers who attended the FBI National Academy during the 50 years from when it started to the year of my retirement, I was 1 of only 165/.0086% who fired a perfect score on the PPC or TRC), Appreciation from the Drug Enforcement Administration, Outstanding Community Service from Bellevue Jaycees, Human Rights (Implementing Law and Order with Justice) from Baha'i Communities of Bellevue and Eastside, Youth Service from the Chief Seattle Council of the Boy Scouts of America, Program Innovation from the King County Domestic Violence Coalition, Support and Service from Bellevue Cadet Squadron Auxiliary USAF, Law Enforcement Appreciation from the Puget Sound Chapter of the American Society for Industrial Security (presented by the Governor of the State of Washington), Outstanding Volunteer Service from the Salvation Army, Outstanding Service as a Public Official Citizenship Award from the Bellevue Kiwanis Club, Appreciation from the United States Secret Service, **Award for Public Service from The U.S. Department of Justice**, Recognition for 30 Years of Public Service from the City of Bellevue, Recognition and Commendation Resolution by the Municipality of Metropolitan Seattle, Appreciation for Service from the Woodland Park Zoo Bond Oversight Committee, Appreciation for Service from the King County Executive, Appreciation for Personal Contribution to Developing Bellevue Convention Center from the City of Bellevue, Outstanding Support of the Arts (jointly with wife) from the City of Bellevue Arts Commission, Commendation for Outstanding Service from the City of Bellevue.

## CURRENT PHOTOGRAPH

D.P. Van Blaricom - November 28, 2012

8



EXHIBIT "B"

**D.P. VAN BLARICOM, Inc.**
*POLICE PRACTICES EXPERT*
835 - 91ST LANE N.E.
BELLEVUE, WASHINGTON 98004-4811
(425) 453-0082   FAX 453-3263   E-Mail dvbinc@aol.com

_____

TAX ID 91-1437291

# SCHEDULE OF FEES FOR SERVICES

Retainer.................................................................$ 3,000.00
Hourly...................................................................$    395.00
Daily......................................................................$ 3,950.00
Deposition: **MINIMUM** ........................................$ 2,000.00
Expenses...............................................................   Actual

# EXHIBIT "C"

**D. P. VAN BLARICOM, Inc.**
MPA, FBI-NA, CHIEF OF POLICE (RET.)
***POLICE PRACTICES EXPERT***
835 91ˢᵗ LANE NORTHEAST
BELLEVUE, WASHINGTON 98004-4811
(425) 453-0082   FAX (425) 453-3263   E-Mail dvbinc@aol.com

## COMPLIANCE WITH FEDERAL RULE OF PROCEDURE 26 (a) (2) (B) TESTIMONY AT TRIAL OR DEPOSITION FOR PRECEDING 4 YEARS

**04**-1122 *Arnold v. City of Atlanta*, US Northern District GA 1:03-CV-0087-CAP, gave deposition 2/6/12;

**06**-1308 *Bletz v. Gribble* (Ionia County), US Western District MI 1:08-cv-533, gave deposition 1/27/12;

06-1329 *Glenn v. Washington County*, US District OR 3:08-cv-00950-MO, testified at trial 8/22/12;

07-1372 *Driggers v. City of Creve Coeur*, US Central District IL 06-1112, testified at trial 3/4/09;

07-1415 *Kichnet v. Butte-Silver Bow County*, Anaconda-Deer Lodge County, MT DV-09-80, gave deposition 1/19/11;

**09**-1505 *Campbell v. City of Spokane*, US Eastern District WA CV-08-134-JPH, testified at trial 11/16/10;

09-1521 *Roznowski  v. City of Federal Way*, King County, WA 09-2-19157-3 KNT, testified at trial 12/9 & 13/10;

09-1528 *Hernandez v. City of Clovis,* Curry County, NM D-09050CV-20080298, testify at trial 9/25/13;

09-1533 *Sykes v. City of Snohomish*, Snohomish County, WA 09-2-09751-6, gave deposition 10/25/10, testified at trial 10/16/12;

09-1534 *Ramirez v. Cochise County*, Pima County, AZ C20096671, testified at trial 7/21/11;

09-1545 *Berresford & Hart v. Holy Spirit Hospital*, Cumberland County, PA 06498-2001, gave deposition 6/3/10;

09-1552 *Gorman v. Pierce County*, Pierce County, WA 10-2-11380-6, testified at trial 8/3/11;

09-1555 *Rigg v. City of Lakewood*, US District CO 11-cv-03044-RBJ-BNB, gave deposition 5/31/13;

2

09-1557 *Haley v. City of Elsmere*, US   Eastern District KY 2:08-CV-00106, gave deposition 3/14/12;

**10**-1573 *Clark v. City of West Richland*, US District Eastern WA CV-10-5060-EFS, gave deposition 1/31/11;

10-1583 *Navarro v. City of Fontana*, US Central District CA EDCV 09-01525 VAP (DTBx), gave deposition 2/8/11;

10-1585 *Young v. City of Sierra Vista*, Cochise County, AZ CV 2008 00893, gave deposition 10/12/10 & testified at trial 11/1/10;

10-1586 *Cadle v. City of Los Angeles*, Los Angeles County BC395094, testified at trial 10/21/10;

10-1589 *Dowling v. Maricopa County*, US District AZ CV09-1401-PHX-JAT, gave deposition 3/3/11 & 12/16/11;

10-1591 *Remato v. City of Phoenix*, US District AZ CV09-02027-FJM, gave deposition 2/10/11 & testified at trial 9/16/11;

10-1593 *Barnes v. City of Jackson*, Hinds County, MS 251-04-281 CIV, testified at trial 1/9/12;

10-1594 *Chung v. LVMPD*, US District NV 2:10-cv-00277-PMP-RJJ, testified at trial 7/11/13;

10-1596 *Okoli v. City of Mesa*, US District AZ CV-10-00176-DGC, gave deposition 11/9/10;

10-1597 *Jarvis v. City of Mesquite*, US District NV 2:09-CV-00851-PMP-GWF, gave deposition 6/13/11;

10-1598 *Bryson v. Humphrey*, Benton County, MS B2009-029, gave deposition 10/26/10;

10-1600 *Dixon v. City of Coeur d'Alene*, US District ID 2:10-cv-00078-LMB, testified at trial 10/26/11;

10-1601 *Wachsmuth v. City of Powell*, US District WY 10-CV-041-J, gave deposition 1/11/11 & testified at trial 2/18/11;

10-1603 *Rutherford v. City of Seattle*, US Western District WA C09-1693-MJP, gave deposition 12/1/10 & testified at trial 5/19/11;

10-1607 *Gaytan-Alcaya v. USA*, US District AZ CF 10-327/10-367/11-383-TUC-FRZ, gave deposition 5/10/12;

10-1609 *Cabral v. City of Providence*, RI Superior Court 08-7497, gave depositions 7/18 & 9/6/12;

10-1611 *Pendleton v. City of Goodyear*, US District AZ CV 09-2213-PHX-MHM, gave deposition 3/18/11;

3

10-1612 – *Kita v. City of Seattle*, US   Western District WA C10-160 JCC, gave deposition 1/20/11;

10-1613 *Denny v. City of Brandon*, Minnehaha County, SD CIV. 09-1619, gave deposition 3/11/11;

10-1615 *Lovejoy v. Arpaio*, US District AZ 2:09-cv-01912-PHX-NVW, gave deposition 6/232/11;

10-1618 *Gallegos v. Whatcom County*, Skagit County, WA 07 2 00226 2, gave deposition 4/29/11;

10-1620 *Mattingly v. City of San Francisco*, US Northern District CA C-10-0193 JL, gave deposition 5/17/11;

__11__ -1624 *Hingorani v. Kent School District*, King County, WA 08-2-20671-8 KNT, gave deposition 3/4/11;

11-1627 *Ostling v. City of Bainbridge Island*, US District Western WA 3:11-cv-05219, gave deposition 1/23/12 and testified at trial 5/21/12;

11-1630 *Jones v. Sandusky County*, US Northern District OH 3:10-CV-2261, gave deposition 8/13/14 and testified at trial 10/22/14;

11-1638 *Keeley v. State of MT*, Lewis & Clark County, MT ADV-2009-194, gave deposition 9/1/11 & testified at trial 11/2/11;

11-1641 *Meloche v. City of Prescott Valley*, Yavapai County, AZ P1300CV201002077, gave deposition 4/5/12 & testified at trial 10/25/12;

11-1642 *Miniter v. City of Los Angeles*, US Central District CA CV10-5826 MMM (AGRx), gave deposition 6/9/11 & testified at trial 9/15/11;

11-1644 *Harvey v. Navajo County*, US District AZ 3:10-CV-08025-JWS, testified at trial 5/16/12;

11-1647 *Georgianni v. State of Arizona*, Maricopa County, AZ CV2010-008403, gave deposition 3/16/12 & testified at trial 3/11/13;

11-1649 *Storm v. City of Pasco*, US Eastern District WA CV-10-5093-EFS, gave deposition 3/19/12;

11-1650 *Parraz v. Maricopa County*, US District AZ 2:10-cv-01663-ROS, gave deposition 1/16/12;

11-1653 *Villarreal v.City of Kennewick*, US District Eastern WA CV-11-5136-RMP, gave deposition 12/18/12;

11-1655 *Creach v. Spokane County*, US District Eastern WA CV-11-432-RMP, gave deposition 1/15/13;

11-1662 *Phibbs v. City of Reno*, US District NV 3:11-CV-00168-HDM-VPC, gave deposition 2/24/12;

4

11-1663 *Arredondo v. Santa Barbara*    County, Santa Barbara County, CA 1370977, gave deposition 4/27/12;

11-1665 *Glidden V. Spokane County*, Spokane County, WA 11-02-04437-2, gave 1st deposition 1/9/13, 2nd 4/22/14 & testified at trial 3/26-27/13;

11-1667 *Nakagawa v. Maui County*, US District HI CV 11-00130 DKW BMK, gave deposition 11/18/13;

11-1668 *Jenkins v. Spokane County*, US Eastern District WA CV-10-228-EFS, gave deposition 11/8/11 & testify at trial 4/17/12;

11-1669 *Todd v. City of Kalispell*, US District MT CV-10-127-M-DWM, gave deposition 12/8/11;

11-1676 *Doi v. Hawaii County,* US District HI CV10-00639 LEK/RLP, gave deposition 6/1/12;

11-1678 *Retz v. City of Omaha*, US District NE 8:11CV169, gave deposition 8/20/12 & testified at trial 4/17/13;

11-1679 *Barnett v. City of Houston*, US Southern District TX 4:11-cv-01464, gave depositions 4/30/12 & 5/31/12;

11-1684 *Al-Hakim v.City of Riverside*, US Western District MO 4:11-CV-01225-DGK, gave deposition 1/24/13;

**12**-1685 *Corrales v. City of Phoenix*, US District AZ CV11-00287-PHX-ROS, gave deposition 6/19/12;

12-1691 *Washington v. City of Los Angeles*, Los Angeles County, CA BC438920, gave deposition 3/5/12;

12-1696 *Felix v. USA*, US District AZ CV-11-1203-PHX-PGR, gave deposition 5/30/12;

12-1697 *Saldana v. City of Lakewood*, US District Western WA 3:11-cv-06066-RBL, gave deposition 1/28/13;

12-1699 *Dunaway v. Floyd County*, Floyd County, GA 11 CV 01563 JFL001, gave deposition 10/1/12;

12-1700 *Arsenault v. City of Seattle*, US District Western WA 11-cv-01200-JLR, testified at trial 8/21/12;

12-1702 *Braaten v. State of WA*, Benton County 11-2-00364-4, gave deposition 6/25/12;

12-1711 *Marquez v. Eddy County*, US District NM 11-CIV-838 JAP/WDS, gave deposition 9/2/14;

12-1712 *Davila-Marquez v. City of Pasco*, US District Eastern WA CV-12-5059-LRS, gave deposition 3/18/13;

5

12-1713 *Thompson v. Torrance County*, Torrance County, NM D-0722-CV-2009-00174, gave deposition 8/31/12,

12-1714 *Thiess v. Snohomish County*, US District Western WA C12-1880-TSZ, gave deposition 9/17/13;

12-1715 *Gomez v. City of Albuquerque*, US District NM CIV 12-070 LH/ACT, gave deposition 9/16/13;

12-1718 *Mersier v. City of Atlanta*, Fulton County, GA 2010CV188455, gave deposition 8/30/12;

12-1719 *Pullen v. Snohomish County*, US District Western WA 11-cv-0167, gave deposition 10/19/12;

12-1720 *Binchus v. Skagit County*, Snohomish County, WA 11-2-08078-0, gave deposition 10/29/12;

12-1722 *Muniz v. USA*, US Northern District OH 3:09-CV-0865, gave deposition 9/20/12;

12-1725 *Willard v. City of Everett*, US District Western WA 2:12-cv-00014-TSZ, gave deposition 5/10/13;

12-1726 *McDonald v. City of Tacoma*, US District Western WA C11-5774 RBL, gave deposition 12/28/12;

12-1730 *Casablanca v. King County*, US District Western WA 2:12-cv-01132-MJP, gave deposition 6/24/13;

12-1732 *Petersen v. Lewis County*, US District Western WA C12-5908-RBL, gave deposition 11/4/13;

12-1733 *Ali v. City of Tempe*, Maricopa County, AZ CV2013-091264, gave deposition 6/30/14;

**13**-1740 *Hazan v. LVMPD*, US District NV 2:12-cv917-LDG-PAL, gave deposition 7/23/13;

13-1742 *Hor v. City of Seattle*, King County, WA 10-2-34403-9 SEA, gave deposition 3/29/13 & testified at trial 6/6/13 & 6/10/13;

13-1743 *Davis v. Clark County*, US Western District WA 3:12-cv-5765 RJB, gave deposition May 20, 2013;

13-1749 *Stapley v. Maricopa County*, US District AZ CV-11-00902- PHX-NVW, gave deposition 7/30/13;

13-1755 Morris v. Summit County, US District CO 12-cv-02134-RPM-MEH, gave deposition 9/18/13;

13-1759 *Jones v. City of Oakland*, US District Northern CA CV 12-1416 MEJ, gave deposition 5/23/13;

6

13-1760 *Cordeiro v. USA*, US District HI 11-00413 JMS BMK, gave deposition 6/20/13;

13-1763 *Chavez v. Kern County*, US Eastern District CA 1:12-cv-01004 JLT, gave deposition 1/31/14;

13-1764 *Thomas v. City of Colville*, US Eastern District WA CV-13-120-TOR, gave deposition 6/25/14;

13-1769 *Bunyan v. City of Hooper Bay*, AK 4th Judicial District 4BE-384 CI, testified at trial 1/29/14;

13-1771 *Roos v. City of Phoenix*, US District AZ CV 12-01247-PHX-NVW, gave deposition 9/30/13;

13-1773 *Carshall v. LeFlore County*, US District OK 13-CV-274-JHP, gave deposition 3/17/14;

13-1778 *Wallace v, LVMPD*, Clark County, NV A-12-661698-C, gave deposition 12/19/13;

13-1780 *Ehlers v. City of Rapid City*, US District SD CIV. 12-5093, gave deposition 8 22, 2014;

13-1788 *Abbey v. City of Reno*, US District NV 3:13-cv-00347-VPC-LRH, gave deposition 4/2/14;

**14**-1792 *Tokuoka v. City of Hoonah*, AK 1st Judicial Judicial District 1JU-12-776 CI, gave deposition 6/26/1,

14-1793 *Castro V. Dona Ana County*, US District NM CIV 13-483 CG/GBW, gave deposition 10/27/14.

**TOTAL TESTIMONY**
**4 Years Preceding October 28, 2014**

U.S. Department of Justice
Office of Justice Programs
*National Institute of Justice*

**EXHIBIT "D"**



 **National Law Enforcement Technology Center**

June 1995

A National Institute of Justice Program

# Positional Asphyxia—Sudden Death

*Major portions of this bulletin are drawn from a report prepared by the International Association of Chiefs of Police for the National Institute of Justice (NIJ), based on research conducted by Dr. Charles S. Petty, Professor of Forensic Pathology, University of Texas, and Dr. Edward T. McDonough, Deputy Chief Medical Examiner, State of Connecticut, and reviewed by the Less-Than-Lethal Liability Task Group.*

Police, sheriffs, and correctional officers have a limited and largely inadequate set of tools to use to safely subdue violent and aggressive subjects. Through NIJ's National Law Enforcement Technology Center (NLETC), the Federal Government is working to identify and support the development of a range of less-than-lethal technologies—from those suitable for one-on-one encounters to those that might be used for stopping fleeing vehicles. In a recent analysis of in-custody deaths, we discovered evidence that unexplained in-custody deaths are caused more often than is generally known by a little-known phenomenon called positional asphyxia.

This NLETC bulletin presents information relevant to positional asphyxia—i.e., death as a result of body position that interferes with one's ability to breathe—as it occurs within a confrontational situation involving law enforcement officers. We offer this information to help officers recognize factors contributing to this phenomenon and, therefore, enable them to respond in a way that will ensure the subject's safety and minimize risk of death.

The bulletin identifies factors found to precipitate positional asphyxia, and provides recommendations for ensuring a subject's safety and advisory guidelines for care of subjects. Information regarding the collection of potential evidence in cases involving positional asphyxia is also included. Through officer awareness and resultant action, it is anticipated that deaths attributable to this cause will be reduced.

Sudden in-custody death is not a new phenomenon—it can occur at any time, for a variety of reasons. Any law enforcement agency may experience a sudden in-custody death, and while rare, such deaths appear to be associated most often with the following variables:

■ **Cocaine-induced bizarre or frenzied behavior.** When occurring while confined by restraints, cocaine-induced excited delirium (an acute mental disorder characterized by impaired thinking, disorientation, visual hallucinations, and illusions) may increase a subject's susceptibility to sudden death by effecting an increase of the heart rate to a critical level.

■ **Drugs and/or alcohol intoxication.** Drug and acute alcohol intoxication is a major risk factor because respiratory drive is reduced, and *subjects may not realize they are suffocating.*

■ **Violent struggle** extreme enough to require the officers to employ some type of restraint technique. Subjects who have engaged in extreme violent activities may be more vulnerable to subsequent respiratory muscle failure.

■ **Unresponsiveness of subject** during or immediately after a struggle. Such unresponsive behavior may indicate cardiopulmonary arrest and the need for immediate medical attention.

It is important to understand how preexisting risk factors, combined with the subject's body position when subdued or in transit, can compound the risk of sudden death. Information contained in this bulletin may help to alert officers to those factors found frequently in deaths involving positional asphyxia.

## Basic Physiology of a Struggle

A person lying on his stomach has trouble breathing when pressure is applied to his back. The remedy seems relatively simple: get the pressure off his back. However, during a violent struggle between an officer or officers and a suspect, the solution is not as simple as it may sound. Often, the situation is compounded by a vicious cycle of suspect resistance and officer restraint:

■ A suspect is restrained in a face-down position, and breathing may become labored.

■ Weight is applied to the person's back—the more weight, the more severe the degree of compression.

CCE13312014_00001.jpg

12/31/2014 1:56 PM

- The individual experiences increased difficulty breathing.

- The natural reaction to oxygen deficiency occurs—the person struggles more violently.

- The officer applies more compression to subdue the individual.

## Predisposing Factors to Positional Asphyxia

Certain factors may render some individuals more susceptible to positional asphyxia following a violent struggle, particularly when prone in a face-down position:

- Obesity.

- Alcohol and high drug use.

- An enlarged heart (renders an individual more susceptible to a cardiac arrhythmia under conditions of low blood oxygen and stress).

The risk of positional asphyxia is compounded when an individual with predisposing factors becomes involved in a violent struggle with an officer or officers, particularly when physical restraint includes use of behind-the-back handcuffing combined with placing the subject in a stomach-down position.

## Advisory Guidelines for Care of Subdued Subjects

To help ensure subject safety and minimize the risk of sudden in-custody death, officers should learn to recognize factors contributing to positional asphyxia. Where possible, avoid the use of maximally prone restraint techniques (e.g., hogtying). To help minimize the potential for in-custody injury or death, officers should:

Follow existing training and policy guidelines for situations involving physical restraint of subjects.



**Officer Subduing a Violent Suspect and How It Can Interfere With Breathing**

Subject's chest fully extended.

Breathing becomes labored due to pressure being exerted on subject's back.

Officer subdues violent suspect.

- As soon as the suspect is handcuffed, get him off his stomach.

- Ask the subject if he has used drugs recently or suffers from any cardiac or respiratory diseases or conditions such as asthma, bronchitis, or emphysema.

- Monitor subject carefully and obtain medical treatment if needed.

- Be trained to recognize breathing difficulties or loss of consciousness and immediately transport the individual to the emergency room, or call for an emergency medical team (EMT) unit if such signs are observed.

- Obtain medical care upon subject's request.

- If the subject is turned over to a detention facility, inform the facility's custodians of any preexisting medical conditions (cardiac, respiratory) or that the subject requested or needed medical treatment because of respiratory difficulty or because he became unconscious

## Collection of Potential Evidence

Officers involved in confrontational situations should collect information that may later be of value in a civil or perhaps criminal action.

A use-of-force report should include details of how the individual was

2

restrained. The following information should be included:

- What was the nature of the postarrest restraint procedure? Identify whatever type of restraint (including chemical incapacitants) was used.

- How long was the subject face down and/or restrained?

- How was the subject transported, and in what position was the subject during transport?

- How long did the transport phase last, and what observations were made of the subject's condition?

To reasonably establish the cause of death or serious injury, a broad range of factors must be examined:

- Nature of the confrontation.

- Weapon(s), if any, employed by officers.*

- Duration of the physical combat.

- System or type of postarrest restraint employed.

- Transportation of the subject: destination, duration, mode of transport, and position of subject during transport.

- Emergency room observations and actions, names of attending medical personnel.

- Postmortem examination (autopsy) of subject: nature of injuries, diseases present, drugs present, and other physical factors.

_____
*If any incapacitant was used (e.g., pepper spray), the delivery system should immediately be secured for possible analysis.

## Conclusion

To help minimize the risk of positional asphyxia, diligent observation and monitoring of subjects displaying any one or a combination of the described indicators are procedurally warranted. Furthermore, the use of maximal, prone restraint techniques should be avoided. If prone positioning is required, subjects should be closely and continuously monitored. By implementing such procedural protocols, the potential for in-custody deaths may be lessened.

---

### NLETC Bulletin

The *NLETC Bulletin* is designed as a forum for disseminating to the law enforcement and criminal justice communities the most current information on technologies relevant to your needs. We welcome your comments or recommendations for future *Bulletins.*

---

The National Law Enforcement Technology Center is designing data bases to help respond to agencies that want to know who manufactures a specific product and what other agencies may be using that product. Your contributions to the Center's information network are important. What technologies or techniques are you using that you would like to share with colleagues? Please call or write to the National Law Enforcement Technology Center, P.O. Box 1160, Rockville, MD 20849, 800-248-2742.

---

### NYPD's Guidelines to Preventing Deaths in Custody

- As soon as the subject is handcuffed, *get him off his stomach.* Turn him on his side or place him in a seated position.

- If he continues to struggle, *do not sit on his back.* Hold his legs down or wrap his legs with a strap.

- Never tie the handcuffs to a leg or ankle restraint.

- If required, get the suspect immediate medical attention.

- Do not lay the person on his stomach during transport to a station house or hospital. Instead, place him in a seated position.

- An officer should sit in the rear seat beside the suspect for observation and control.

The New York City Police Department (NYPD) has developed a training tape on positional asphyxia. The Department has agreed to make the tape available to interested law enforcement agencies. To request a complimentary copy, please send your written request on departmental letterhead, and a blank VHS tape, to the Deputy Commissioner of Training, NYPD, 235 East 20th Street, New York, New York 10003.

---

The National Law Enforcement Technology Center is supported by Cooperative Agreement #95-IJ-CX-K002 awarded by the U.S. Department of Justice, National Institute of Justice.

The National Institute of Justice is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, Bureau of Justice Statistics, Office of Juvenile Justice and Delinquency Prevention, and Office for Victims of Crime.

3

CCE12312014_00003.jpg

12/31/2014 1:56 PM

# EXHIBIT "E"

## POLICE RESPONSE TO EXCITED DELIRIUM

*By D.P. Van Blaricom, MPA, CHIEF of POLICE (Ret)*

© 2007

Although there have been years of debate on the subject, in both the scientific and law enforcement communities, it is now generally accepted that a combined psychological and physical phenomenon called excited delirium (ED) does exist, [1] and police patrol officers should be prepared to encounter persons experiencing that potentially fatal crisis condition. Since officers may be reasonably expected to be confronted with such a situation in the field, they must be adequately prepared to best respond, and that preparation requires a basic understanding of the problem, followed by the necessary training.

**How To Recognize:** Persons experiencing an episode of ED will invariably be displaying what is best described as "*bizarre behavior*" that cannot otherwise be rationally explained. Hallucinations are common and can cause uncontrollable paranoia, agitation, and hostility. Communication is nearly impossible and incoherent yelling or indistinguishable animal-like sounds may be the only response to an officer's attempt to develop rapport. Extremely high body temperatures will be obvious

from profuse sweating and can cause the person to strip naked, while frequently attempting to cool himself with any available water. So-called "*superhuman strength,*" an apparent inability to feel pain and seemingly inexhaustible energy are characteristic too. [2,3] Accordingly, a police officer may be called to the scene of a person in a state of ED and suddenly be faced with a screaming naked man, who is fighting unseen demons, thrashing around in a public fountain and ready to fight, with unbelievable strength, against anyone trying to control him. Furthermore, he will have no reaction to any of the usual pain compliance techniques and OC spray will have no effect whatsoever. ED is a critical medical emergency; [4,5] and police efforts to overpower an affected person, with the sheer weight of numbers, will involve an exhaustive struggle that may suddenly and unexpectedly result in an in-custody death. When such a death occurs, the person will typically have been subdued by multiple officers, using their combined weight to hold him face down, [6] until he is handcuffed, hobbled and perhaps (but not recommended) hog-tied. During the struggle or immediately thereafter, as the person continues to fight against his restraints, he or she will suddenly become calm and be found to have stopped breathing. Even though he or she may be resuscitated, he will never regain consciousness; and, although some victims survive in a vegetative state, most soon die, in spite of medical intervention. After the fact, the decedent will be found to have been either mentally ill (paranoid schizophrenic or bi-polar) or under the influence of street drugs (cocaine or methamphetamine). [7,8] Actual cause of death will be found to be inconclusive; but restraint asphyxia, by position or compression, will frequently be listed as contributory – litigation, of course, is then likely to follow. This contemporary and serious police problem demands a preplanned response by trained patrol officers and their supervisors.

**What Not To Do:** An officer should not attempt to control a person in a state of ED by him or herself, because he or she will be unable to do so by ordinary

---

[1] "Excited Delirium," Force Science Research Center, 2006.

[2] In-Custody Deaths, International Association of Chiefs of Police (IACP), 1994.
[3] *Excited Delirium Syndrome*, DiMaio & DiMaio, 2006
[4] "British Columbia TASER Commission Report," IACP Policy Review, 2005.
[5] *Supra* note 3.
[6] "Sudden Death," National Law Enforcement Technology Center, 1995.
[7] *Guide to Forensic Pathology*, Dix & Calaluce, 1999.
[8] *Supra* note 3.

CCE12312014_00004.jpg

means. It is dysfunctional to spray him with OC, strike the person with a baton or shoot the person with impact projectiles, because he or she does not feel pain and has an inexhaustible reservoir of great strength. In fact, such usual methods will likely fuel the person's hostile behavior and only serve to increase more desperate resistance when he believes that he is literally fighting for his life. Although the combined strength and weight of four or more physically fit officers may subdue a person suffering ED after a prolonged struggle, that tactic may also end in his sudden death. Officers must, however, bring the subject under control, as quickly as possible, and attempt to prevent his or her death by obtaining rapid medical treatment before overwhelming exhaustion preempts such life-saving relief.

**What Should Be Done:** As with most foreseeable police problems, training [9],[10] is the best means to plan a response in advance of having to cope with the inevitable. Since police officers are dispatched to most of these encounters, call takers and dispatchers should be trained to recognize the signs of an ED report and query the caller for clarifying information that will forewarn the responding officers.[11] When a call appears to be such a report, the dispatcher should identify the run as a potential ED, dispatch multiple patrol units and a supervisor, immediately co-dispatch an emergency medical services (EMS) advanced life support (ALS) unit and notify the hospital emergency room (ER) to standby. The first officer(s) on the scene should contain the incident, as best possible, without making further contact, and await a sufficient number of officers (usually four or more) to provide the alternative (but less desirable) option of physically overpowering the person, if that should ultimately become necessary. Fortunately, the one police tool that seems to work best on a person in a state of ED is the TASER electronic control device (ECD). That widely issued less-lethal weapon has a neuro-muscular incapacitation (NMI) capability to immediately render ANYONE incapable of further voluntary movements to fight and/or resist. (Note that it will not, however, function effectively in the pain compliance *"drive stun"* mode).[12] Accordingly, and after the device's probes are projected into the body from a safe distance, electrical pulsations can be continuously applied until the person is quickly secured in handcuffs and hobbles, without the exhausting struggle that may otherwise result in sudden death. It should be noted, incidentally, that in spite of anecdotal claims to the contrary, there is no

evidence that a TASER application has caused the death of any person; and, in fact, the scientific evidence refutes those claims.[13],[14] Medics can then secure the restrained person to a gurney lying on his or her side (not prone) and quickly transport the person to a hospital ER for rapid administration of a calming sedative. By having quickly brought the person under control, without the exhaustive struggle that is most closely associated with ED sudden deaths, the person is more likely to survive this experience. In fact, the International Association of Chiefs of Police (IACP) has reported, *"A single TASER application made before the subject has been exhausted, followed by a restraint technique that does not impair respiration may provide the optimum outcome."*[15]

**Conclusion:** ED will continue to be serious police problem that is only likely to become worse, because of an ever-increasing number of mentally ill persons are on our streets, many of whom are homeless,[16] and the widespread use of both cocaine and methamphetamine. Although conventional control techniques do not work on a person in a state of ED, the TASER does provide a method for quickly taking immediate and complete control. As previously explained herein, the best opportunity to prevent the sudden deaths associated with a prolonged and exhaustive ED struggle is rapid control and the earliest possible medical treatment. If police officers are properly trained in how best to respond to the ED event that many are certain to have thrust upon them, lives can be saved and costly litigation avoided.

**About the Author:** D.P. Van Blaricom is a retired Chief of Police for the City of Bellevue, WA; and he serves as a police practices consultant throughout the United States. He has BA and MPA degrees and is certified in forensics. Additionally, he is an FBI NA graduate and is a Life Member of the IACP. He has currently reviewed over 60 sudden in-custody deaths, many of which involved excited delirium.

---

[9] IACP Legal Officers Section, 2005.
[10] Supra note 3.
[11] Supra Note 3.
[12] "Technology Overview," TASER, 2006.

---

[13] "Scientific Basis for the TASER Weapon Cardiac Safety," TASER 2006.
[14] Supra note 3.
[15] Supra note 4.
[16] The Criminal Justice/Mental Health Consensus Project, 2002.